COHN LIFLAND PEARLMAN HERRMANN
  & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

COUGHLIN STOIA GELLER RUDMAN &
  ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT

### DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATIONAL JUNIOR BASEBALL LEAGUE, Individually and on Behalf Of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>    vs.<br><br>PHARMANET DEVELOPMENT GROUP, INC., JEFFREY P. MCMULLEN, and JOHN P. HAMILL,<br><br>                  Defendants. | No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

NATIONAL JUNIOR BASEBALL LEAGUE v. PHARMANET DEVELOPMENT GROUP, INC. et al    Doc. 1

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by PharmaNet Development Group, Inc. ("PharmaNet" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of purchasers of the common stock of PharmaNet between November 1, 2007 and April 30, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff National Junior Baseball League, located at 4 White Spruce Lane, Hauppage, New Jersey, as set forth in the accompanying certification, which is incorporated by reference herein, purchased the common stock of PharmaNet at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant PharmaNet is a global, drug development services company that provides a comprehensive range of services to the pharmaceutical, biotechnology, generic drug, and medical device industries. The Company's common stock trades under the symbol PDGI on the National Association of Securities Dealers Automated Quotations ("NASDAQ") stock exchange.

8.     (a)     Defendant Jeffrey P. McMullen ("McMullen") is, and was at all relevant times, President, Chief Executive Officer ("CEO") and Director of PharmaNet.

       (b)     Defendant John P. Hamill ("Hamill") is, and was at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of PharmaNet.

       (c)     Defendants McMullen and Hamill are collectively referred to herein as the "Individual Defendants."

9.     During the Class Period, the Individual Defendants, as senior officers and/or directors of PharmaNet, were privy to confidential and proprietary information concerning PharmaNet, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning PharmaNet, as discussed in detail below. Because of their positions with PharmaNet, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of PharmaNet's business.

11.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

12.     As senior officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to PharmaNet's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of PharmaNet common stock would be based upon truthful and accurate information.

The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct, which operated as a fraud or deceit on purchasers of PharmaNet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding PharmaNet's business, operations, management and the intrinsic value of PharmaNet common stock; and (ii) caused Plaintiff and members of the Class (defined below) to purchase PharmaNet common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of PharmaNet between November 1, 2007 and April 30, 2008, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, and, at all relevant times, the members of their immediate families, their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PharmaNet common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PharmaNet or its transfer agent and may be notified of the pendency of

this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and reported results of PharmaNet;

        (c)     whether the price of PharmaNet common stock was artificially inflated during the Class Period; and

        (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     Defendant PharmaNet is a drug development services company that maintains offices and facilities located in North America, Europe, South America, Asia, Africa and Australia and has clients in the branded pharmaceutical, biotechnology, generic drug and medical device industries.

21.     The Company operates in two business segments: (1) the early stage segment, which consists primarily of Phase I and bioequivalency clinical trial services and bioanalytical laboratory services; and (2) the late stage segment, which consists primarily of Phase II through Phase IV clinical trial services and a comprehensive array of related services, including data management and biostatistics, medical and scientific affairs, regulatory affairs and submissions, clinical information technology services and consulting services.

22.     The Class Period begins on November 1, 2007. On that date, PharmaNet issued a press release announcing its financial results for the third quarter of 2007, the period ended September 30, 2007. For the quarter, the Company reported that direct revenue increased 31.3% to $99.8 million and that the Company's backlog as of September 30, 2007 was $472.5 million. With respect to backlog and the Company's book-to-bill ratio, the press release stated, in pertinent part, as follows:

> The Company's backlog increased sequentially to $472.5 million at September 30, 2007 compared to $444.0 million at June 30, 2007. Backlog consists of anticipated direct revenue from written awards, letters of intent and contracts that either have not started or are anticipated to begin in the near future. Verbal awards are not included in backlog.
>
> The book to bill ratio was 1.3x at September 30, 2007 compared to 1.2x at June 30, 2007. Book-to-bill is calculated by taking the change in backlog between periods plus direct revenues divided by direct revenues.
>
> Early stage book-to-bill was 1.2x at September 30, 2007 and June 30, 2007.
>
> Late stage book-to-bill was 1.4x at September 30, 2007 compared to 1.1x at June 30, 2007.

*     *     *

Backlog for the early stage segment increased sequentially to $65.8 million at September 30, 2007 compared to $59.8 million reported at June 30, 2007.

*　　　*　　　*

Backlog for the late stage segment increased sequentially to $406.7 million at September 30, 2007 compared to $384.2 million at June 30, 2007.

Defendant McMullen commented on the results stating, in pertinent part, as follows:

We are very pleased with our operating performance this quarter. We recorded the highest direct revenues in the history of the Company and continued to increase backlog. Building on this momentum, we are raising guidance for 2007.

23.     Following the press release, PharmaNet held a conference call with analysts and investors to discuss the earnings release and the Company's operations. During the call, Defendant McMullen spoke positively about the Company's financial results stating, in pertinent part, as follows:

We had an outstanding third quarter. Direct revenues improved 31% to just under $100 million compared to the third quarter of 2006, due to growth in both the early and late stage segments. The third quarter 2007 adjusted net earnings from continuing operations, increased more than 170%. Backlog increased sequentially by 6%, by almost 34% year-to-date. The book to bill ratio is 1.3 for the third quarter 2007 and 1.4 year to date. Adjusted diluted earnings per share more than doubled, increasing to $0.37 in the third quarter of 2007, from $0.16 for the same period last year.

I would now present the results of the early stage group. This segment had a particularly strong quarter. Early stage direct revenues increased 23% sequentially and increased year-over-year by almost 50% in the third quarter of 2007, resulting from higher revenues in both the bioanalytical laboratories and the clinics. Third quarter of 2007 adjusted operating margins in the early stage segment increased to approximately 22% from approximately 16% in the third quarter of 2006, due to a 63% increase in sample volumes and a 23% increase in clinic activity. During the third quarter, the mix of generic to branded business in the early stage segment remained at second quarter levels with approximately 65% of revenues coming from generic clients and 35% from branded. Early stage backlog reached $65.8 million in the third quarter, up 9% sequentially and 55% year-to-date. Early stage book-to-bill was 1.2 for the quarter.

*　　　*　　　*

I will now move on to our late stage results. This segment also performed well in the third quarter. Late stage direct revenues increased 13% sequentially and increased

year-over-year by 22% in the third quarter of 2007. Adjusted operating margins for the third quarter of 2007 were 22% compared to 15% during the third quarter of 2006, primarily due to continued strong demand and the timing of revenue recognition.

If you recall, last quarter we had an unusually high value of unsigned change orders. During the third quarter, the level of unsigned change orders returned to more typical levels and we were not able to recognize the corresponding revenue. Late stage backlog reached $406.7 million in the quarter, up 5% sequentially and 31% year to date. Late stage book-to-bill was 1.4 for the quarter.

We are increasing non-GAAP guidance for the balance of the year based on both our year-to-date performance and a forecast for the last quarter. While I will let John go through the details of the guidance in a few minutes, this new guidance reflects our confidence in the future of the business in the continuing favorable market environment.

Defendant Hamill also spoke positively about the Company's backlog stating, in pertinent part, as follows:

Backlog increased sequentially by 6% to $472.5 million on September 30, 2007 compared to $444 million at June 30, 2007. GAAP corporate selling, general and administrative expenses increased to $7.5 million in the third quarter of 2007 compared to $5 million in the third quarter of 2006 primarily due to additional $1.5 million reserve recorded in the third quarter of 2007 related to the securities class action settlement and other related litigation.

We are updating guidance as listed in this morning's press release to reflect our continued confidence in the early and late stage businesses. For continuing operations in 2007, the company expects direct revenue to be between $361 million to $365 million. Adjusted EBIT margin of 10.6% to 10.8%. Adjusted pre-tax earnings of $29 million to $31 million. GAAP fully diluted EPS of $0.53 to $0.59 per share. Adjusted fully diluted EPS of $1.22 to $1.29. We expect to provide full year 2008 guidance when we release earnings for the fourth quarter.

24.     On or about November 9, 2007, PharmaNet filed its Form 10-Q for the quarter ended September 30, 2007 with the SEC, which was signed by Defendants McMullen and Hamill and confirmed the previously announced financial results for the 2007 third quarter.

25.     The statements referenced above in ¶¶22-24 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them:

(a)     the Company's backlog contained numerous contracts which were likely to be cancelled;

(b)     the Company had ramped up expenses in order to perform contracts even though there was a substantial likelihood that the contracts would be cancelled;

(c)     that the Company was entering into contracts with highly-risky bio-technology and pharmaceutical companies where the risk that the contract would be cancelled was greatly increased; and

(d)     given the above factors, Defendants lacked a reasonable basis for their positive statements about the Company, its business, backlog and earnings guidance.

26.     On February 28, 2008 PharmaNet issued a press release announcing its financial results for the fourth quarter and year end of 2007, the period ended December 31, 2007. For the quarter the Company reported direct revenues of $92.3 million and backlog of $457.4 million as of December 31, 2007. With respect to the Company's backlog and book-to-bill ratio, the press release stated, in pertinent part, as follows:

**The Company's backlog decreased to $457.4 million at December 31, 2007, compared to $472.5 million at September 30, 2007, primarily due to cancellations of certain projects in the early and late stage segments.** Backlog consists of anticipated direct revenue from written awards, letters of intent and contracts that either have not started or are anticipated to begin in the near future. Verbal awards are not included in the reported backlog.

The quarter-to-date book-to-bill ratio was 0.8x at December 31, 2007, compared to 1.3x at September 30, 2007 reflecting the aforementioned cancellations. Book-to-bill is calculated by taking the change in backlog between periods plus direct revenues divided by direct revenues.

Early stage book-to-bill was 1.1x at December 31, 2007.

Late stage book-to-bill was 0.6x at December 31, 2007.

With respect to earnings guidance, the press release stated, in pertinent part, as follows:

Guidance

For full year 2008, the Company expects:

| Metric | Guidance |
|---|---|
| Direct Revenue | $401 to $409 million |
| Operating margin (%) | 10.1% to 10.3% |
| Corporate Expenses | $23.6 million to $24.1 million |
| Diluted earnings per share | $1.42 to $1.57 |
| Capital expenditures | $14 million to $16 million |
| Depreciation | $13.5 million to $15 million |
| Amortization | $2.8 million |
| Tax rate | 12% to 15 |

Defendant McMullen commented on the results stating, in pertinent part, as follows:

We are pleased with our 2007 financial results, having made significant progress over the past year. In 2008, we look forward to continued growth and market expansion, while optimizing our operations, increasing resource utilization and reducing costs.

[Emphasis added.]

27. Following the press release PharmaNet held a conference call with analysts and investors to discuss the earnings release and the Company's operations. During the call Defendant McMullen discussed the Company's high level of project cancellations stating, in pertinent part, as follows:

Full-year 2007 results were strong in terms of direct revenues, net earnings, backlog and the balance sheet, which was significantly strengthened. Fourth quarter 2007 adjusted net earnings from continuing operations were $6.3 million or $0.33 per diluted share, compared to $6.8 million or $0.36 per diluted share in the fourth quarter of 2006.

This is primarily due to higher direct costs and SG&A partially offset by higher revenues and the favorable impact of a net tax benefit resulting from an increase in the company's deferred tax assets related to Canadian tax credits. These will likely be utilized in the carry-forward periods.

While fourth quarter 2007 direct revenues increased 16.7% to $92 million compared to the fourth quarter 2006 due to growth in both segments. Operating margins were lower in the fourth quarter, primarily due to investments in personnel, new facilities and offices, executive severance of $900,000, and higher professional fees.

Backlog declined sequentially by 3% in the fourth quarter due to cancellations in both the early and late stage segments, which also resulted in a lower book-to-bill

ratio of 0.8. I can assure you that the cancellations were not connected to our performance on the related projects.

In regards to operating performance in the fourth quarter, we made significant investments in our early and late stage segments to facilitate future growth and geographic expansion. To offset some of the associated costs and with our goal to improve long-term profitability, we have been actively developing and implementing reductions of both direct costs and SG&A.

Already we have identified approximately $2 million of cost that we can avoid going forward. In addition, we continue to focus our efforts on optimizing our operations through process improvements, increasing research utilization and reducing costs. I will discuss this further when I review the business segment results.

As mentioned earlier, we finished the year with favorable results and continued to make significant advances over our 2006 performance. Full-year 2007 GAAP net earnings increased 99.6% in 2007 to $0.63 per diluted share, as compared to 2006, and exceeded our full year 2007 guidance. 2007 direct revenue is up 20%, backlog is up almost 30%, and cash, cash equivalents and investments in marketable securities are up 49% compared to the full year 2006.

\*       \*       \*

In addition, there were a number of clinical projects that were either rescheduled, postponed or canceled during the latter part of the quarter. Our clinics were staffed to run these studies, and when the projects were pushed out of the fourth quarter, the clinics operated at a lower than expected utilization level, which negatively impacted the segment's margins.

We believe these shifts in project timing are temporary and we remain confident that there has not been a systematic change in market conditions that would impact continued growth in the early stage segment, which was in excess of 30% in both the fourth quarter and the year.

We are actively perusing ways we can flexibly respond to last minute shifts in demand patterns such as those we experienced in December in order to optimize these operations. The performance of the bioanalytical laboratories was very strong with sample volumes up approximately 17%.

Early stage backlog reached $69.5 million at the end of the fourth quarter, up 5.6% sequentially and 64% year-to-date. Early stage book-to-bill was 1.1 for the fourth quarter. As I mentioned previously, the early stage backlog in the fourth quarter was impacted by the cancellation of certain projects. However, the majority of those projects have already been rescheduled for the early part of 2008.

\*       \*       \*

Late stage backlog at the end of the fourth quarter was $387.9 million. While it is 25% higher year-over-year, it is 5% lower than the last quarter. Comparatively, third quarter 2007 new business awards have been very strong.

In the fourth quarter 2007, the cancellation of certain projects resulted in a net negative impact on the segment's backlog. We believe this to be temporary and I have often conveyed the lumpy nature of new business awards and cancellations. We have also had quarters where new business awards are higher than average and cancellations are lower than average. Unfortunately, these factors worked against us in the fourth quarter.

*    *    *

In closing, we have come a long way since the end of 2006. We have made significant strides in improving our financial metrics with respect to earnings, direct revenues, backlog and the balance sheet. We've continued to put legacy issues behind us while moving forward on key strategic initiatives, including our global expansion program and new business development initiatives, especially in emerging markets.

And while we do not have anything to announce at this time, we continue to search for potential medical imaging acquisitions and to develop a platform to enter the clinical trial materials management arena. We look forward to 2008. Our objectives include our continued efforts to grow the business, leverage our infrastructure, build our competitive position and enhance our profitability.

*    *    *

The cancellations [] particularly one of the larger ones in that group was from a top pharmaceutical company with a product that I would say the world felt was a very promising product. So, it is not that we took on a risky project, a risky product, a risky company.

We are pretty careful about looking at the strength of the balance sheet of any smaller biotech company that we would work with. And certainly the ethics of the trial, but also I guess the prospects for the particular product we're looking at. Nobody has a crystal ball. Nobody can predict which studies will succeed and which won't. That is why we do these studies but we certainly aren't, will not take on something that isn't a reasonable product and a reasonable company.

28.      In response to the announcement of project cancellations, the price of Pharmanet stock declined from $41.35 per share to $28.62 per share. Defendants, however, continued to conceal the true facts about the Company's backlog and the fact that many more contracts were likely to be cancelled.

29.     On or about March 31, 2008, PharmaNet filed its Form 10-K for the year ended

December 31, 2007 with the SEC, which was signed by Defendants McMullen and Hamill and

confirmed the previously announced financial results for the 2007 fourth quarter and year-end.

30.     Then, on April 30, 2008, PharmaNet issued a press release announcing its financial

results for the first quarter of 2008, the period ended March 31, 2008. For the quarter, the Company

reported direct revenue of $86.8 million and backlog of $482.9 million. With respect to backlog, the

press release stated, in pertinent part, as follows:

> The Company's backlog increased to a record $482.9 million at March 31, 2008,
> compared to $457.4 million at December 31, 2007. The quarter-to-date book-to-bill
> ratio was 1.3x at March 31, 2008, for the early and late stage segments, compared to
> a total book-to-bill of 0.8x at December 31, 2007.
>
> *     *     *
>
> Backlog for the early stage segment increased to $82.0 million at March 31, 2008,
> compared to $69.5 million at December 31, 2007.
>
> *     *     *
>
> **Despite the cancellations totaling approximately $59 million that occurred over
> the past two quarters, backlog for the late stage segment increased to $400.9
> million at March 31, 2008, compared to $387.9 million at December 31, 2007.**

With respect to earnings guidance, the press release stated, in pertinent part, as follows:

> Guidance
>
> The combined impact on projected revenue resulting from the late stage cancellations
> occurring in the fourth quarter 2007 and the first quarter 2008 is estimated to be
> $30.0 million for the full year 2008. In addition, the Company expects to record a
> charge of approximately $1.5 million in the second quarter 2008 related to office
> closures.
>
> As a result of the above and the normal timing of the new business wins, the
> Company has revised its expectations for its 2008 financial performance. For the full
> year 2008, the Company now expects:

|  | Revised guidance | Previous guidance |
| --- | --- | --- |
| Direct revenue | $390 million to $399 million | $401 to $409 million |
| Operating margin % | 5.8% to 6.2% | 10.1% to 10.3% |
| Corporate expenses | $23.9 to $24.4 million | $23.6 to $24.1 million |

| | | |
|---|---|---|
| Diluted EPS | $0.53 to $0.63 | $1.42 to $1.57 |
| Capital expenditures | $14 to $16 million | $14 to $16 million |
| Depreciation | $13.5 to $15 million | $13.5 to $15 million |
| Amortization | $2.8 million | $2.8 million |
| Tax rate | 25% to 28% | 12% to 15% |

Defendant McMullen, commenting on the results, stated:

> While earnings were adversely impacted by higher-than-expected cancellations which occurred in the fourth quarter 2007 and again in the first quarter 2008, we are encouraged by the significant new business wins allowing us to build our backlog. It is important to note that the cancellations are not the result of our performance, but are instead related to clients' decisions about the product under study.

> We believe the higher backlog clearly indicates that we continue to be competitive in the fundamentally strong market for outsourced CRO services and enjoy our clients' confidence in our abilities.

[Emphasis added.]

31. Following the press release PharmaNet held a conference call with analysts and investors to discuss the earnings release and the Company's operations. Defendant McMullen again spoke about the project cancellations stating, in pertinent part, as follows:

> First quarter 2008 direct revenues increased 2.4% to $86.8 million compared to the first quarter 2007. Strong early stage direct revenue growth was impacted by lower late stage revenues resulting in significant project cancellations in the fourth quarter 2007, as we previously disclosed, and again in the first quarter 2008.

> Similar to the last quarter, the vast majority of the $30 million in cancelled projects in the first quarter was for ongoing projects. Specifically, the cancellations from the two quarters totaling $59 million negatively impacted first quarter direct revenue by $6.6 million and for the full year 2008 we expect the combined impact to our direct revenues to be approximately $30 million.

> Fortunately we will be able to somewhat offset these cancellations with significant new business wins, which have increased our backlog to approximately $483 million, a new record for the company.

> However, our near-term challenge is to manage through the next quarters while the impact of these and other new projects is realized.

> We expect to feel the impact of the unusually high level of cancellations throughout the year, but we believe our strength in backlog clearly indicates a trend of long-term growth, the continued confidence of our clients and our ability to compete in the growing market for outsourced CRO services.

During the last quarterly conference call we discussed certain early stage projects that were moved out of the fourth quarter and I would like to update you on their status. Of the 30 projects, 15 have been started and completed, eight have been cancelled and the seven remaining projects are still on hold.

Our business development team has also been refining their sales plans to increase throughput through our clinics and laboratories and diversifying the client base utilizing our facilities. We also continue to enhance our access to special patient populations to enable us to win new clients and projects, particularly in Montreal and Toronto.

Early stage backlog reached $82 million at the end of the first quarter, up almost 18% sequentially. As I mentioned earlier, this growth will allow us to leverage the investments we have made over the past year in both facilities and personnel.

In the late stage segment direct revenues decreased 10.7% in the first quarter 2008 compared to the first quarter 2007, primarily due to the previously mentioned cancellations. As we discussed during our last call, weaker late stage bookings and cancellations of ongoing business in the fourth quarter 2007 are affecting our financial performance in 2008.

As the first quarter progressed, we again experienced higher than expected cancellations of $30 million. The majority of these were ongoing studies that resulted primarily from biotech companies deciding to not continue their studies. This was unlike the fourth quarter of last year where the majority of the cancellations were related to large pharmaceutical companies.

The reasons for the cancellations were mixed, but approximately 60% resulted from the drugs showing a lack of efficacy in companion studies. In addition, we are aware that biotech funding is dramatically lower compared to last year and while it may have contributed to our clients' decisions, we will continue to monitor this closely.

Once again, none of the cancellations were the result of our inability to perform nor did the cancelled studies go to any of our competitors.

*     *     *

I would now like to take a few minutes to discuss our new guidance. We have been working on rolling the cancellations through the budget. The combined cancellations from the fourth quarter 2007 and the first quarter of 2008 totaling $59 million negatively impacted direct revenue by approximately $6.6 million in the first quarter, of which most would have dropped to the bottom line had the projects not been cancelled. For the full year 2008 the impact from the cancellations is estimated to be $30 million.

32.     In response to the announcement, the price of PharmaNet stock dropped from $23.86 per share to $17.10 per share on extremely heavy trading volume.

33.     On September 11, 2008, PharmaNet issued a press release announcing that it was "updating its 2008 full year earnings guidance primarily due to the postponement and cancellation of certain of the Company's ongoing clinical development projects in the late stage segment and a lower than expected sample volume of business in the early stage segment." PharmaNet updated its expectations for 2008 as follows:

|  | New Guidance | Previous Guidance |
|---|---|---|
| Direct revenue | $358 to $366 million | $390 to $399 million |
| Operating margin | 0 to 1.8 percent | 5.8 to 6.2 percent |
| Corporate expenses | $20 to $21 million | $23.9 to $24.4 million |
| Diluted EPS | ($0.58) to ($0.25) | $0.53 to $0.63 |
| Capital expenditures | $10 to $13 million | $10 to $16 million |
| Depreciation | $13.5 to $15 million | $13.5 to $15 million |
| Amortization | $2.8 million | $2.8 million |
| Tax expense | $3.5 million | 25 to 28 percent |

PharmaNet represented that it was updating its guidance primarily as a result of:

- A reduction of approximately $10 million of expected late stage direct revenue in the second half of 2008 primarily related to the recent cancellation of ongoing projects sponsored by both biotechnology and small-to-mid size pharmaceutical companies. These cancellations will negatively impact the Company's backlog by approximately $58.3 million. The resulting year-to-date late stage cancellation rate as of August 31, 2008 is 32.7%, as a percentage of year-to-date written new business authorizations.

- A reduction of approximately $9 million of expected late stage direct revenue in the second half of 2008 related to the postponement of certain aspects of a project sponsored by a large pharmaceutical company.

- Adjustments to the Company's forecasting model to reflect the potential for additional cancellations and postponements in the late stage segment and the impact of foreign exchange translation.

- A reduction of approximately $6 million of expected early stage direct revenue in the second half of 2008 primarily related to a laboratory project postponement of $1 million, lower sample volumes and the impact of foreign currency exchange translation.

34. In response to these events, the price of PharmaNet stock on September 12, 2008 plunged more than 50% from $23.06 to $11.27, on extremely heavy trading volume.

35. The market for PharmaNet common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, PharmaNet common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired PharmaNet common stock relying upon the integrity of the market price of PharmaNet common stock and market information relating to PharmaNet, and have been damaged thereby.

36. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PharmaNet common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

37. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about PharmaNet's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of PharmaNet and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## Additional Scienter Allegation

38.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding PharmaNet, their control over, and/or receipt and/or modification of PharmaNet's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PharmaNet, participated in the fraudulent scheme alleged herein.

## Loss Causation/Economic Loss

39.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of PharmaNet common stock and operated as a fraud or deceit on Class Period purchasers of PharmaNet common stock by failing to disclose that PharmaNet's backlog had became highly concentrated with risky projects that subjected the Company to significant risks and that that market conditions materially impaired PharmaNet's operations.

40.     When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of PharmaNet common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of PharmaNet common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

41.     The precipitous decline in the price of PharmaNet common stock after this disclosure

came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed

to investors and the market.  The timing and magnitude of the price decline in PharmaNet common

stock negates any inference that the loss suffered by Plaintiff and the other Class members was

caused by changed market conditions, macroeconomic or industry factors or Company-specific facts

unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by

Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to

artificially inflate the prices of PharmaNet common stock and the subsequent significant decline in

the value of PharmaNet common stock when Defendants' prior misrepresentations and other

fraudulent conduct were revealed.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

42.     At all relevant times, the market for PharmaNet common stock was an efficient

market for the following reasons, among others:

(a)     PharmaNet stock met the requirements for listing, and was listed and actively

traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, PharmaNet filed periodic public reports with the SEC

and the NASDAQ;

(c)     PharmaNet regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and

(d)     PharmaNet was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43.     As a result of the foregoing, the market for PharmaNet common stock promptly digested current information regarding PharmaNet from all publicly available sources and reflected such information in PharmaNet's stock price. Under these circumstances, all purchasers of PharmaNet common stock during the Class Period suffered similar injury through their purchase of PharmaNet common stock at artificially inflated prices and a presumption of reliance applies.

## No Safe Harbor

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PharmaNet who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

48.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PharmaNet common stock. Plaintiff and the Class would not have purchased PharmaNet common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

49.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of PharmaNet common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     The Individual Defendants acted as controlling persons of PharmaNet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of PharmaNet, and their ownership of PharmaNet common stock, the

Individual Defendants had the power and authority to cause PharmaNet to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  November 20, 2008

COHN LIFLAND PEARLMAN HERRMANN
& KNOPF LLP
PETER S. PEARLMAN

_____
            PETER S. PEARLMAN

Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

- 22 -

COUGHLIN STOIA GELLER RUDMAN &
   ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

DYER & BERENS LLP
ROBERT J. DYER III
JEFFREY A. BERENS
682 Grant Street
Denver, Colorado 80203
Telephone: 303/861-1764
303/395-0393 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint and authorized its filing.

2.      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.      Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| PDGI | 1-9-2008 | 1000 | 38,160, 95 |
|  | 2-15-08 | 300 | 11,346 95 |
|  | 2-15-08 | 700 | 27,937 00 |
|  | 2-20-08 | 3000 | 81,940, 95 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| PDGI |  |  |  |

5.      During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _9_ day of _NOV_, 2008 in _HAUPPAUGE_ , _NY_ .
                                          City              State

(Signature) X _Frank Klein_

_PRESIDENT._

**National Junior Baseball League**