*NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NATIONAL JUNIOR BASEBALL LEAGUE, individually and on Behalf of all others similarly situated, | : : : : : | Civ. Action. No. 08-5723 (FLW) |
| Plaintiff, | : : | **OPINION** |
| v. | : : : | |
| PHARMANET DEVELOPMENT GROUP INC., JEFFREY P. MCMULLEN, and JOHN P. HAMILL, | : : : : | |
| Defendants. | : : | |

## Wolfson, District Judge:

Presently before the Court is a motion by Defendants PharmaNet Development Group, Inc. ("PharmaNet" or the "Company"), Jefferey P. McMullen ("McMullen"), and John P. Hamill ("Hamill") (collectively, "Defendants"), to dismiss Lead Plaintiff Macomb County Employees' Retirement System's ("Macomb County" or "Plaintiff")[1] Amended Class Action Complaint ("Amended Complaint"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  In this putative class action securities litigation, Plaintiff alleges that it and other similarly situated investors purchased PharmaNet's stock between November 1, 2007 and October 29, 2008 (the "Class Period"), and that Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 (the

---

[1]     By the Court's Order dated February 18, 2009, Macomb County was appointed as lead plaintiff in this case.

"Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated under, 17 C.F.R. §240.10b-5; in addition, Plaintiff avers that Defendants McMullen and Hamill (collectively, "Individual Defendants") have violated Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). Specifically, Plaintiff asserts that Defendants fraudulently inflated PharmaNet's stock by misrepresenting the Company's financial figures and concealing from the market serious problems that PharmaNet faced, and that Plaintiff and other investors relied on these material misrepresentations and omissions to their detriment. Defendants move to dismiss the Amended Complaint based on the fact that Plaintiff has failed to plead the elements of a Section 10(b) claim with particularity.  For the reasons stated herein, Defendants' motion is granted and Plaintiff's claims are dismissed without prejudice; however, Plaintiff shall have 30 days from the date of the Order accompanying this Opinion to amend its Amended Complaint consistent with this Opinion.

## BACKGROUND

For the purposes of this motion, the Court will accept the facts as alleged in the Amended Complaint as true.  Defendant PharmaNet[2] is a contract/clinical research organization ("CRO") that provides a range of drug development services globally to the pharmaceutical, biotechnology, generic drug, and medical device industries. Am. Compl. at ¶18.  During the Class Period, PharmaNet was (and remains) headquartered in Princeton, New Jersey, Id. at ¶¶1, 15, and

---

[2]    Pharmanet's common stock was publicly traded during the Class Period on the NASDAQ Global Select Market ("the NASDAQ") under the ticker symbol "PDGL."

> "operated in two business segments: (i) the early-stage segment, which primarily consisted of Phase I and bioequivalency clinical trial services and bioanalytical laboratory services, and included designing studies, assisting clients in preparing study protocols, recruiting and screening study participants, conducting early stage clinical trials and collecting and reporting data to clients; and (ii) the late-stage segment, which primarily consisted of Phase II through Phase IV clinical trial services and a comprehensive array of related services, including data management and bio statistics, medical and scientific affairs, regulatory affairs and submissions, clinical information technology services and consulting services."

Id. at ¶58. Defendant McMullen has served as President, CEO and a member of the Board of Directors of PharmaNet since March 2006, December 2005 and June 2005, respectively. Id. at ¶19. Defendant Hamill has served as Executive Vice President, CFO, Treasurer and Secretary of PharmaNet since 2006. Id. at ¶20. Hamill also began functionally serving as Chief Accounting Officer ("CAO") of PharmaNet in November of 2007. Id.

In 1996, McMullen co-founded PharmaNet, Inc. ("PNI"), PharmaNet's predecessor. Id. In December of 2004, PNI was acquired, through a merger, by SFBC International, Inc. ("SFBC"), and PNI then became known as SFBC. Id. at ¶¶19, 58, 64.[3] After the merger, SFBC "began routinely disclosing the size and amount of its contractual backlog, [defined in PharmaNet's quarterly and annual filings] as the anticipated direct revenue from written notification of awards, letters of intent and

---

[3]    The Amended Complaint cites two different dates for SFBCs acquisition of PNI; 2005, see Amend. Compl. at ¶19, and December of 2004. Id. at 64. The Court will use the more specific date of December 2004.

written contracts," a practice continued by PharmaNet.[4] Id. at ¶68.  By the start of the Class Period, PharmaNet touted backlog to its investors and urged financial analysts to rely on backlog as the most important measure of its financial health and business prospects, and tied backlog to its book-to-bill ratio.[5]   Id. at ¶70. PharmaNet also disclosed backlog on a quarterly basis, and Defendants McMullen and Hamill discussed backlog in annual reports and other filings and during earnings conference calls. Id. at ¶71. PharmaNet reported in its 2007 Annual Report that backlog was valued at $457 million, as opposed to $353 million the previous year, an increase of nearly 30%. Id. Revenue from late-stage clinical trials made up 85% of the 2007 backlog. Id.

Beginning in 2005, a series of adverse information regarding SFBC was made public, including, the payment of extra compensation to clinical trial participants in order to procure their participation in more than one study at a time and subsequent requests by SFBC for those participants to sign affidavits denying the improprieties, coupled with threats of deportation to coerce cooperation. See Id. at ¶¶60-61. When these improprieties became known, SFBC's stock fell 68% and the Senate Finance Committee launched an investigation into SFBC's treatment of patients.  In December 2005, shareholders began filing suit against SFBC, and shortly thereafter, the

---

[4]    After SFBC's acquisition of PNI, SFBC's business became primarily focused on late stage clinical trials, which are completed in excess of the typical 60 day length of an average early-stage clinical trial, which had been SFBC's primary source of revenue prior to the acquisition of PNI. (See Amend. Compl. at ¶¶68-69).

[5]    PharmaNet defined book-to-bill ratio as "the change in backlog between periods plus direct revenues divided by direct revenues." (Amend. Compl. at ¶70).

Securities and Exchange Commission ("SEC") also launched an investigation. Id. at ¶60. Consequently, several high-level executives of SFBC resigned amidst the firestorm, including Lisa Krinsky, SFBC's founder, President and Chairman. Id. at ¶¶59, 61.

SFBC's problems continued, as it was forced to raze its Miami testing facility, which "handled more than two-thirds of [its] workload and generated nearly 30% of [its] operating revenue." Id. at ¶62. SFBC's testing operations were subsequently transferred to Canada,  but in December 2005, a participant involved in a drug trial in Montreal infected other participants and SFBC employees with tuberculosis. Id. at ¶62-63. This caused several pharmaceutical companies to cease doing business with SFBC, including Isotecknika, Inc. and Bristol-Myers Squibb. Id. Following these negative events, in August 2006, SFBC changed its name to PharmaNet Development Group, Inc. (a defendant in this case). Id. at ¶64.

Numerous federal securities fraud class actions and federal shareholder derivative actions were filed, and then consolidated and settled on August 1, 2007 for $28.5 million ("the Settlement"). Id. at ¶¶64-65. A portion of the Settlement, $10.4 million, was not covered by insurance, and PharmaNet was authorized to issue up to $4 million of common stock to the shareholder class to cover this shortfall. Id. at ¶65-66. This additional common stock was to be valued according to the "volume weighted closing price for the 10 trading days leading up to the date the district court enters an order formally approving the settlement" Id. at ¶66 (quoting PharmaNet's 2007 Annual

Report). The Settlement was approved on March 10, 2008, and PharmaNet issued 135,870 shares of common stock valued at $4 million, or $29.44 per share, on March 24, 2008. Id.

In this action, Plaintiff's securities claims relate to PharmaNet's quarterly releases and earnings calls in November 2007, February 2008, April 2008, September 2008, and October 2008, as well as statements pertaining to PharmaNet's financial performance during the Class Period. See Id. ¶¶ 136-52, 156-72, 177-84. Plaintiff, relying, inter alia, on the statements of twelve Confidential Witnesses ("CWs"), see Amend. Compl. at ¶¶32-55, 82-102, 106-18, 124-34, alleges that a series of more than two-dozen public statements made by Defendants were materially misleading. See Id. at ¶¶136-204. These include: the failure to accurately portray the reasons for a growing number of contract cancellations; inclusion in the backlog of contracts that were unlikely to generate revenue; failure to promptly recognize an impairment charge to PharmaNet's goodwill and indefinite-lived assets; and the improper inclusion of unsigned changed orders[6] in backlog and in revenue, which served to intentionally and fraudulently inflate PharmaNet's financial figures. Id. at ¶¶4, 8, 79-80. Plaintiff

---

[6]   "Change Orders" were generated "when the scope of work performed by [PharmaNet] need[ed] to be modified from that originally contemplated by [a] contract with clients." Amend. Compl. at ¶75. Defendant's 2007 Annual Report stated that PharmaNet "cannot recognize additional revenue anticipated from change orders until appropriate documentation is received . . . from the client authorizing the change made . . . . [consequently], [i]f the scope of a contract changes significantly during the course of a study and the contract is revised, the adjustment to backlog occurs when the revised contract is approved by the client." Id. at ¶77.

asserts that this allegedly fraudulent financial picture enabled PharmaNet insiders to profit from insider trading and to artificially buoy the price of PharmaNet's stock in order to fund the Settlement, restore PharmaNet's damaged reputation, fund potential acquisitions and provide an alternative to less viable capital sources. Id. at ¶¶3, 9-10, 205.  Plaintiff further alleges that as Defendants' improprieties became known to the market, PharmaNet's stock price fell from $35.95 per share at the beginning of the Class Period to $1.16 at the end, thus causing Plaintiff and the putative class of shareholders significant damages.[7]  Id. at ¶¶11-12, 17, 26, 242-43.   Plaintiff's allegations of misrepresentations and omissions on the part of Defendants fall into four categories: (1) undisclosed substantial "client dissatisfaction" with PharmaNet, which contributed to cancellations, thus making favorable financial statements inaccurate; (2) fraudulent inflation of PharmaNet's backlog due to cancelled projects and unsigned change orders;  (3) unsigned change orders recognized as revenue; and (4) failure to timely record impairment charges.

    As these allegations are central to the Court's legal analysis, the Court will discuss them in more detail below.

_____

[7]    The precipitous drop of PharmaNet's stock price allowed affiliates of the private equity firm JLL Partners ("JLL") to acquire PharmaNet on March 30, 2009, for $5.00 per share. As a result of this Going-Private Transaction, PharmaNet became a privately-held company. (Amend. Compl. at ¶18).

## DISCUSSION

**I.      Pleading Requirements of a 10b-5 Claim**

**A.      Elements of a 10b-5 Claim**

The Securities Act of 1933, 48 Stat. 74, as amended, 15 U.S.C. §77a <u>et seq.</u>,

("Securities Act") and The Securities Exchange Act of 1934, 48 Stat. 881, as amended,

15 U.S.C. §78a <u>et seq.</u>, were enacted, respectively, to ensure "full and fair disclosure

of the character of securities sold in interstate and foreign commerce and through the

mails, and to prevent frauds in the sale thereof . . ." <u>Blue Chip Stamps v. Manor Drug</u>

<u>Stores</u>, 421 U.S. 723, 725, 728 (1975), and "to provide for the regulation of securities

exchanges and of over-the-counter markets operating in interstate and foreign

commerce and through the mails, to prevent inequitable and unfair practices on such

exchanges and markets . . ." <u>Id</u>. at 728. Section 10(b) of the Exchange Act states, in

pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of
> any means or instrumentality of interstate commerce or of the mails, or
> of any facility of any national securities exchange
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange or any security not
> so registered, or any securities-based swap agreement . . . any
> manipulative or deceptive device or contrivance in contravention of such
> rules and regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors.

15 U.S.C. §78j(b). In 1942, under the authority granted to it by the statute, the SEC

promulgated Rule 10b-5, 17 CFR §240.10b-5. <u>Blue Chip</u>, 421 U.S. at 729. Rule 10b-5

provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> © To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5. Although the statute does not expressly provide for a private

cause of action, the Supreme Court has long held that such a cause of action exists.

<u>See</u> <u>Blue Chip</u>, 421 U.S. at 729 (<u>citing</u> <u>Superintendent of Insurance v. Bankers Life &</u>

<u>Cas. Co.</u>, 404 U.S. 6, 13 n. 9 (1971)).

A cause of action under Section 10b-5 consists of the following elements: "(1) a

material misrepresentation ...; (2) scienter, i.e., [defendant's] wrongful state of mind;

(3) a connection with the purchase or sale of a security; (4) reliance, often referred to

... as 'transactional causation'; (5) economic loss; and (6) loss causation, i.e., a causal

connection between the material misrepresentation and the loss." <u>Dura Pharm., Inc.</u>

<u>v. Broudo</u>, 544 U.S. 336, 341-42 (2005); <u>McCabe v. Ernst & Young, LLP</u>, 494 F.3d 418,

424 (3d. Cir. 2007); In re Bradley Pharms., Inc. Secs. Litig., 421 F. Supp. 2d 822, 826 (D.N.J. 2006).   In this case, Defendants submit that Plaintiff's allegations of misrepresentations and omissions under Section 10(b) fail to adequately plead material misrepresentations, a strong inference of scienter, or loss causation.

## B.   Heightened Pleading Requirements of Rule 9(b)

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." In re Intelligroup Securities Litigation, 527 F. Supp.2d 262, 275 (D.N.J. 2007); Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir.2000); see also Fed. R. Civ. P. 12(b)(6).[8] However, when the allegations are grounded in fraud, this standard is heightened by Fed. R. Civ. P. 9(b). This Rule requires that allegations of fraud must be plead with particularity,[9] and it

---

[8]   As a general matter under Rule 12(b)(6), a court may not consider matters extraneous to the pleadings without treating the motion as one for summary judgment and giving all parties reasonable opportunity to present materials pertinent to such a motion under Rule 56. An exception is made, however, for a "document integral to or explicitly relied upon in the complaint," and it has been long established that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted)(emphasis omitted).  In securities fraud actions, it is equally well-established that a court may consider public filings such as quarterly and annual reports filed with the SEC.  Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000).

[9]   Rule 9(b) reads, in pertinent part, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

has been "rigorously applied in securities fraud cases." Id. (quoting In re Burlington, 114 F.3d at 1417).

To this end, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") 15 U.S.C § 78u et seq. The purpose of requiring particularized pleadings is to prevent abusive securities litigations. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499 (2007) ("Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law"); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent . . ." (internal quotes and citations omitted)).

"The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss." Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 252 (3d. Cir. 2009) ("Avaya"). First, "under 15 U.S.C. § 78u-4(b)(1), the complaint must 'specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity.'" Id. (quoting Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)).

-11-

Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).[10]

Both provisions of the PSLRA require pleading of facts with "particularity." Avaya, 564 F.3d at 253.  This particularity language "echoes precisely Fed. R. Civ. P.

---

[10]    The PSLRA states, in pertinent part:

(b) Requirements for securities fraud actions

(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(1), (2).

9(b)." In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999); see Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake.").   Indeed, although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." Avaya, 564 F.3d at 253 (citations omitted).  This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." Advanta, 180 F.3d at 534 (internal quotation marks omitted).

Since the substantive allegations of Plaintiff's Amended Complaint are based upon the statements of confidential witnesses, these allegations regarding statements or omissions by Defendants are made upon "information and belief." See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 146 n.10 (3d Cir. 2004) ("Chubb"). In that regard, Section 78u-4(b)(1) adds an additional requirement that plaintiffs must also "state with particularity all facts on which that belief is formed." Id.; Avaya, 564 F.3d at 253.  The Third Circuit explained that

> when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey.

Id.  "[A] complaint can meet the pleading requirement [of the PSLRA] by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." Id. at 261 (quoting Chubb, 394 F.3d at 147).  Therefore, when

evaluating a complaint that is based upon the statements of confidential witnesses, courts "consider the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Id, (quoting Chubb at 148).

In contrast, "the PSLRA's requirement for pleading scienter . . . marks a sharp break with Rule 9(b)." Id. Under § 78u-4(b)(2), "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." Id. (citing Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008)); see Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Instead, under the PSLRA's "[e]xacting' pleading standard for scienter, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Tellabs, 551 U.S. at 313 (internal quotation marks omitted).

## II.    Safe Harbor

As a preliminary matter, Defendant argues that statements regarding PharmaNet's backlog, financial projections and statements about future economic performance fall within the PSLRA's Safe Harbor, 15 U.S.C. §78u-5(c)(1).  This section provides, in pertinent part:

(1)      [A] person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that –

(A) the forward-looking statement is –

   (I)   identified as a forward looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

    (ii)  immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement –

   (i)   if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

   (ii)  if made by a business entity; was –

   (I)   made by or with the approval of an executive officer of that entity; and

   (II)  made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. §78u-5(c)(1).

The statute further clarifies that "forward-looking statements" include statements:

"[C]ontaining a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of 'future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission."   Further, forward looking

statements include "any statement of the assumptions underlying or relating to any statement described" in the definition.

Avaya, 564 F.3d at 255 (quoting 15 U.S.C. §78u-5(i)(1)(A)-(D)).  Moreover, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."  Id. (citing In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement")).

Next, in order to fall within the safe harbor, a forward-looking statement must be identified as such and be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872-873 (3d Cir. 2000) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).  Cautionary language must be "extensive yet specific."  In re Trump Casino Sec. Litig., 7 F.3d 357, 369 (3d Cir. 1993).  However, the safe harbor provision does not apply if the statement was made by a natural person (as compared to a business entity) who had "actual knowledge" at the time that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i).  A forward-looking statement made by a business entity is protected unless it was made by or with the approval of an executive officer of that entity who had actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(ii).

Plaintiff dedicates at least seventeen pages of its Amended Complaint to statements made by Defendants that are allegedly materially misleading.[11] Defendants do not specifically indicate which statements in the Amended Complaint are forward-looking; instead, they provide examples.  Specifically, Defendants argue that the following statements should be regarded as forward-looking statements: statements relating to backlog (see, e.g., ¶¶ 136, 138, 147, 161), statements regarding PharmaNet's financial projections (see, e.g., ¶¶ 138, 140, 159), and statements about future economic performance (see, e.g.,  ¶¶ 139, 149, 161).  In the following sections, the Court will identify the statements in the Amended Complaint that correspond to each of these categories.

### A.    Backlog

In its Amended Complaint, Plaintiff alleges that the following statements regarding backlog were materially misleading:

The November 2007 Press Release and Conference Call

---

[11]    In response to Defendants' argument that Plaintiffs have failed to specify any false or misleading statements, Plaintiff argues that "the actionable statements alleged in the AC are largely emphasized ***in bold and italicized text*** and are thus readily identifiable." (Br. in Opp. at 8 (emphasis in original).) Plaintiff goes on to clarify that it is "not alleging that the entire paragraphs are false, but only the highlighted statements," and that the Amended Complaint is "certainly not short, but if it is a puzzle, it is meant for a child and can be assembled readily." Id. at 8-9 (quoting Silverman v. Motorola, Inc., No. 07-4507, 2008 U.S. Dist. LEXIS 76799, at *24 (N.D. Ill. Sept. 23, 2008) and In re Honeywell Intern., Inc. Securities Litigation, 182 F.Supp.2d 414, 416 (D.N.J. 2002), respectively). Accordingly, the Court's analysis will focus primarily on statements that Plaintiff has ***highlighted*** in its Amended Complaint.

"Backlog consists of anticipated direct revenue from written awards, letters of intent and contracts that either have not started or are anticipated to begin in the near future." (Amend. Compl. at ¶ 136.)

"Book-to-bill is calculated by taking the change in backlog between periods plus direct revenues divided by direct revenues." Id.

"Backlog increased sequentially by 6%, by almost 34% year-to-date.  The book to bill ratio is 1.3 for the third quarter 2007 and 1.4 year to date." Id. at ¶ 138.

<u>The February 2008 Press Release and Conference Call</u>

"The Company's backlog decreased to $475.4 million at December 31, 2007, compared to $472.5 million at September 30, 2007, primarily due to cancellations of certain projects in the early and late stage segments." Id. at ¶ 147.

"The quarter-to-date book-to-bill ratio was 0.8x at December 31, 2007, compared to 1.3x at September 30, 2007 reflecting the aforementioned cancellations." Id. at ¶ 148.

"The early stage backlog in the fourth quarter was impacted by the cancellation of certain projects.  However, the majority of those projects have already been rescheduled for the early part of 2008." Id. at ¶ 150.

<u>The April 2008 Press Release and Conference Call</u>

"Despite the cancellations totaling approximately $59 million that occurred over the past two quarters, backlog for the late state segment increased to $400.9 million at March 31, 2008, compared to $387.9 million at December 31, 2007." Id. at ¶ 158.

The Court's first inquiry in the Safe Harbor analysis is whether the above-quoted statements are forward-looking.  With respect to allegations concerning backlog, Defendants cite to <u>Payne v. DeLuca</u>, 433 F. Supp. 2d 547 (W.D. Pa. 2006), and other out-of-state cases, for the general proposition that backlog is forward-looking, and therefore protected by the Safe Harbor.  Plaintiff primarily relies on <u>Berson v. Applied Signal</u>, 527 F.3d 982, 990 (9th Cir. 2008), for the proposition that backlog, such as here,

-18-

represents a company's contractual entitlement to perform certain work, and therefore, the foregoing statements are not protected by the Safe Harbor provision.

The Court finds <u>Applied Signal</u>'s treatment of backlog applicable in this case. In <u>Applied Signal</u>, the Ninth Circuit noted that the company at issue, like PharmaNet, defined backlog as "the dollar value of work it has contracted to do but hasn't yet performed." <u>Id.</u> at 990. The court reasoned that because backlog was "a snapshot of how much work the company has under contract right now," not "a 'projection' of earnings or a 'statement' about 'future economic performance,'" statements regarding backlog were not protected by the Safe Harbor. <u>Id.</u>; (<u>quoting</u> 15 U.S.C. §78u-5(i)(1).

Similar to the backlog in <u>Applied Signal</u>, the statements regarding backlog identified in the Amended Complaint consist of "anticipated direct revenue from written awards, letters of intent and contracts that either have not started or are anticipated to begin in the near future." While the backlog in <u>Applied Signal</u> consisted solely of contracts, this fact does not change the "present" nature of the backlog in this case. Indeed, each statement relating to backlog is a present fact that is not a projection of future economic performance; these statements concern the value of backlog at the time the statements were made to the public (<u>e.g.</u>, "backlog for the late state segment increased to $400.9 million at March 31, 2008, compared to $387.9 million at December 31, 2007" <u>see</u> Am. Compl at ¶ 158).

The cases cited by Defendants are factually and otherwise distinguishable from the present case. For instance, in <u>Weiss v. Mentor Graphic Corp.</u>, No. 97-1376, 1999

WL 985141, at *11 (D. Or. Oct. 6, 1999), the court distinguished forward-looking

statements that relied on backlog from present statements regarding the value of

backlog:

> [T]his court concluded that [defendants'] statements regarding backlog
> were not forward-looking because they were based on a confirmable,
> present fact – either [the corporation] had a strong backlog going into
> Q3 1996 or it did not.  Now, however, plaintiff's claim is based on
> whether a strong back-log can be used at all to predict Q3 1996
> performance . . . [T]he prediction that [the corporation] would meet its
> financial projection for Q3 1996 was clearly forward-looking.  The
> representation that a strong backlog was one reason for meeting those
> financial projections is a "statement of the assumptions underlying or
> relating to" the financial projections.  As a result, referring to strong
> backlog as a predictor of future performance is a forward-looking
> statement.

Id.; see also In re: Stone & Webster, Inc., Securities Litigation, 263 F. Supp. 2d 102,

116-17 (D. Mass. 2003)(finding that statements predicting "'improved margins' from

projects in backlog" were forward-looking; this is distinguished from PharmaNet's

statements concerning backlog, which refer to the value of its backlog *in the past and

present*); Payne, 433 F. Supp. 2d at 603-05 (not addressing whether defendants'

statements were forward looking, and instead finding that plaintiff had failed to allege

a material misrepresentation).  Accordingly, because the statements relating to backlog

in the Amended Complaint concern the present value of the backlog, the Court finds

these statements are not forward-looking, and thus, do not fall within the ambit of the

Safe Harbor.

## B.     Financial Projections and Future Economic Performance

The Amended Complaint asserts that the following statements projecting economic growth were materially misleading and not protected by the Safe Harbor Provision:

The November 2007 Press Release and Conference Call[12]

(1) "We are increasing non-GAAP guidance for the balance of the year based on both our year-to-date performance and a forecast for the last quarter . . . this new guidance reflects our confidence in the future of the business in the continuing favorable market environment." Amend. Compl. at ¶ 138.

(2) "For continuing operations in 2007, the company expects direct revenue to be between $361 million to $365 million." Id. at ¶ 140.

The February 2008 Press Release and Conference Call

(3) "In 2008, we are looking forward to continued growth and market expansion, while optimizing our operations, increasing resource utilization and reducing costs." Id. at ¶ 149.

The April 2008 Press Release and Conference Call

(4) "We believe the higher backlog clearly indicates that we continue to be competitive in the fundamentally strong market for outsourced CRO services and enjoy our clients' confidence in our abilities." Id. at ¶ 160.

(5) "We expect to feel the impact of the unusually high level of cancellations throughout the year, but we believe our strength in backlog clearly indicates a trend of long-term growth, the continued confidence of our clients and our ability to compete in the growing market for outsourced CRO services." Id. at ¶ 161.

The September 2008 Press Release and Conference Call

---

[12]   Plaintiff also alleges that similar statements were made in the 2007 Annual Report.

(6) "We are able to recover in the second quarter 2008 from earlier cancellations and we are confident that our determined business development efforts and existing backlog will drive us to profitability in 2009." Id. at ¶ 168.

Plaintiff argues that these statements are not forward-looking because Defendants tied them to historical and present facts, including the composition and health of backlog and historical financial results.[13] For this proposition, Plaintiff relies on In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003). In fact, Nortel's fact-based holding does not support Plaintiff's position. The court there held that "many of the allegedly misleading statements identified in the [ ]Complaint included recitations of historical facts," Id., and because the complaint sufficiently alleged that "the Defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality, the misstatements do not fall under the PSLRA's safe harbor provisions." Id.  In contrast, while Defendants' statements are based on underlying historical facts, the statements are nevertheless forward-looking.  As discussed by the Third Circuit in Avaya, the Safe Harbor extends not only to statements "containing a projection of revenues" and "of future economic performance," but also to "any statement of the assumptions underlying or relating to" such statements. Avaya,564 F.3d at 255.  Indeed, future projections to some degree are based on the historical and present financial situation of a company.  In that respect, the Court finds that the above statements are indeed forward-looking.

---

[13]    Defendants argue that the above statements qualify as inactionable "corporate puffery." However, the Court need not make that determination, because, as discussed more fully below, these quoted statements are "forward-looking" and adequately cautioned.

-22-

The Court's next inquiry is whether these forward-looking statements are accompanied by meaningful cautionary statements.  "In applying the Reform Act safe harbor provision, the court must . . . decide if [a forward looking statement] is accompanied by adequate cautionary statements . . ." Payne, 433 F. Supp.2d at 561.  The Third Circuit has required that "[c]autionary language . . . be 'extensive and specific.'" Avaya, 564 F.3d at 256 (quoting GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 n. 3 (3d Cir. 2003).  Furthermore, "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." Id. (quoting GSC, 368 F.3d at 243).

Here, as its first contention, Plaintiff seemingly argues that a stricter requirement of the "bespeaks caution" doctrine[14] should control the analysis of the

---

[14]    Prior to the enactment of the PSLRA, courts in the Third Circuit, and others, evaluated purportedly "meaningful cautionary language" under the "bespeaks caution" doctrine. See, e.g., Trump, 7 F.3d at 371-73; Kline v. First Western Government Sec., Inc., 24 F.3d 480, 489-90 (3d Cir. 1994); In re Westinghouse Sec. Litig., 90 F.3d 696, 707-10 (3d Cir. 1996) (Alito, J.); Weiner v. Quaker Oats Co., 129 F.3d 310, 320 (3d Cir.1997); see also EP Medsystems, 235 F.3d at 873-75 (reciting a history of the doctrine in the Third Circuit and addressing its use in other circuits). Under the "bespeaks caution" doctrine, courts will "dismiss[] securities fraud claims under Rule 12(b)(6) because cautionary language in the offering document negated the materiality of an alleged misrepresentation or omission." Trump, 7 F.3d at 371. The Trump court went on to explain that,

> when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document

sufficiency of "cautionary statements" under the PSLRA, 15 U.S.C. § 78u-5(c)(1)(A)(I).

Relaxing the standard of the bespeaks caution doctrine, the PSLRA states that an issuer is not liable for a forward-looking statement if it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." See 15 U.S.C. § 78u-5(c)(1)(A)(I).  While the Third Circuit has incorporated much of the "bespeaks caution" doctrine into its analysis of the PSLRA, see Avaya, 564 F.3d at 256, the stricter language of the "bespeaks caution" doctrine is noticeably absent, and the Third Circuit has repeatedly distinguished the two concepts.[15]  Accordingly, since the PSLRA applies

_____

> provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

Trump, 7 F.3d at 371. However, "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." Kline, 24 F.3d 7 at 489 (quoting Trump, F.3d at 371-72). To clarify, "the language bespeaking caution relate directly to that by which plaintiffs claim to have been misled." Id. The "bespeaks caution" doctrine further requires that "[a] cautionary statement must discredit the alleged misrepresentations to such an extent that "the risk of real deception drops to nil." In re MobileMedia Sec. Litig., 28 F.Supp.2d 901, 928 (D.N.J. 1998) (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097 (1991)). The MobileMedia court went on to explain the parameters of the PSLRA safe harbor, which did not include the above requirement. See MobileMedia, 28 F.Supp.2d at 930.

[15]    The Third Circuit has also applied the "bespeaks caution" doctrine to cases where the PSLRA does not apply. See Semerenko v. Cendant Corp., 223 F.3d 165, 182 n.12, 182-83 (3d Cir. 2000) (applying the "bespeaks caution" doctrine and noting that "the [PSLRA]'s safeharbor . . . does not apply [to this case because] [t]he alleged misrepresentations were made in conjunction with a tender offer and . . . . [t]he safe harbor expressly states that it is inapplicable to statements made in connection with a tender offer"). While the PSLRA has not rendered the "bespeaks

to this case, the Court will follow standards pertaining to the adequacy of cautionary statements set forth in the PSLRA

Turning now to the "cautionary statements" in the instant case, Defendants maintain that the following statements, which "routinely" accompanied PharmaNet's press releases and security filings, alerted investors that PharmaNet's forward-looking statements regarding its backlog, financial projections, and future economic performance were subject to significant regulatory, economic, financial, and operational risks.  For example:

> We cannot assure you that this backlog will be indicative of future results. A number of factors may affect backlog, including: . . . the loss or delay of projects; the change in the scope of work during the course of a project; and the cancellation of such contracts by our clients.

---

caution" doctrine obsolete, see Payne, 433 F.Supp. 2d at 561 (explaining that "enactment of the PSLRA's safe harbor provision did not do away with the judicially created 'bespeaks caution' doctrine"), the PSLRA safe harbor is distinguished from the "bespeaks caution doctrine," see EP Medsystems, 235 F.3d at 873-74 (stating that "the District Court did not rely on . . . the safe harbor provision . . . [i]nstead, the District Court found that the misrepresentations were immaterial under the "bespeaks caution" doctrine," and "the 'bespeaks caution' doctrine, like the safe harbor provision in the Reform Act, is directed only to forward-looking statements.") (emphasis added); Payne at 361 ("Like the safe harbor provision, the bespeaks caution doctrine does not protect forward-looking statements made with actual knowledge of their falsity at the time they are made."); Id.; GSC, 368 F.3d at 243, n.3 (stating that the "bespeaks caution" doctrine requires that "cautionary language should be "directly related to the alleged misrepresentations," but it does not have to "actually accompany the alleged misrepresentation," and distinguishing the doctrine from PLSRA) (internal citations omitted), and has served in many circumstances to effectively supercede it in the context of evaluating the adequacy of cautionary statements. See MobileMedia, 28 F.Supp.2d at 930 ("The safe harbor of the Securities Act . . . however, reaches further than the bespeaks caution doctrine").

> [I]f our clients cancel or defer contracts, our future profitability may be adversely affected . . . . [A]ll of our contracts are generally cancelable by our clients with little or no notice. A client may cancel or delay existing contracts with us at its discretion and is likely to do so for a variety of reasons . . . .
>
> In addition, since a large portion of our operating costs are relatively fixed, variations in the timing and progress of contracts can materially affect our financial results. The loss or delay of a large project or contract or the loss or delay of multiple smaller contracts could have a material adverse effect on our business, financial condition and results of operations."
>
> We cannot assure you that we will be able to realize all or most of the direct revenue included in backlog. Although backlog can provide meaningful information to our management, it is not necessarily a meaningful indicator of future results.

See Form 10K filed on March 31, 2008 at 9, 11; Form10K filed on May 9, 2008 at 26-27; Form 10Q filed on August 6, 2008 at 31-32.

The Court finds that Defendants' "cautionary language" is sufficiently "meaningful." These statements and more were contained in PharmaNet's SEC filings, which adequately detailed a list of specific factors and uncertainties that could affect PharmaNet's future economic performance. See, e.g., PharmaNet's Annual Report for the Period Ended December 31, 2007 (Form 10-K), at 9, 11; PharmaNet's Quarterly Report for the Period Ended March 31, 2008 at 20, 26-27; see also Defendants' Ex. 15 (Chart documenting relevant cautionary statements made by PharmaNet before and during the Class Period). Moreover, in each press release, Defendants also explained that the forward-looking statements involved risks and uncertainties that could cause

actual outcomes and results to differ materially from projections and specifically directed readers to PharmaNet's SEC filings.[16]  Id.

In sum, Defendants' cautionary statements do not "merely warn[] the reader that the investment has risks . . . ." Avaya, 564 F.3d at 256.  In fact, the language is not in the nature of a vague blanket disclaimer, but rather, is tailored specifically to risks associated with PharmaNet's financial projections which were primarily based upon the company's backlog, and alerts shareholders to the specific sources of that risk – such as loss or delay of projects, changes in the scope of projects, outright cancellation, and variations in timing and progress.  See Silverman v. Motorola, Inc., No. 07-4507, 2008 U.S. Dist. LEXIS 76799, at *33 (N.D. Ill. Sep. 23, 2008)(stating that it is sufficient to mention "important factors that could cause actual results to differ materially" without "list[ing] every factor" or even "the particular factor that ultimately causes the forward-looking statement not to come true"); Avaya, 564 F.3d at 257-58.  These statements, therefore, satisfy the requirements of 15 U.S.C. §78u-5(c)(1)(A)(I).

---

[16]    With respect to PharmaNet's conference calls, the transcript of these teleconferences routinely indicated that the statements made by Individual Defendants during the conference calls were "based on the company's current plans and expectations and involve risks and uncertainties that could cause actual outcomes and results to materially differ from those set forth in the forward-looking statements."  See Q3 2008 Earnings Call at p.1.  The transcript referenced PharmaNet's reports and filings with the SEC in that regard.  Id. at 2.  See In re Merck & Co. Sec. Litig., 432 F.3d 261, 273 n.11 (3d Cir. 2005) (stating that "[c]autionary statements do not have to be in the same document as the forward looking statements").

Finally, Plaintiff maintains that Defendants' forward-looking statements are not protected by the Safe Harbor because Defendants knew the statements were false at the time they were made.  To counter, Defendants posit that the Safe Harbor protects forward-looking statements accompanied by meaningful cautionary language, irrespective of the Defendants' state of mind.  In support of this position, Defendants rely on the following out-of-circuit cases:  <u>Miller v. Champion Enters., Inc.</u>, 346 F.3d 660, 672 (6th Cir. 2003)("[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind"); <u>Harris v. IVAX Corp.</u>, 182 F.3d 799, 803 (11th Cir. 1999)(same); <u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185, 201 (1st Cir. 1999); <u>see also</u> <u>ATI Techs., Inc. Sec. Litig.</u>, 216 F. Supp. 2d 418, 429 (E.D. Pa. 2002).[17]  However, the Court need not address this issue.  In fact, the Third Circuit in <u>Avaya</u>, confronted with the same argument and out-of-circuit rulings cited by Defendants here, declined to address this issue, because plaintiffs there failed to plead a strong inference that defendants acted with actual knowledge that their projections were false or misleading. See <u>Avaya</u>, 546 F.3d at 259.  This point is dispositive here; since the Court concludes, <u>infra</u>, that Plaintiff fails to plead a strong inference of scienter with respect to Defendants' actual knowledge, "this scienter conclusion provides a ground for dismissing [Plaintiff's] claims relating to the forward-looking statements, one that would apply even assuming defendants' cautionary language was inadequate."  <u>Id.</u>

---

[17]    Plaintiff also argues, unpersuasively, that the dangers PharmaNet warned of had already transpired.  However, Plaintiff does not sufficiently allege that Defendants had knowledge of the alleged falsity of their statements. <u>See</u> <u>infra</u>.

## IV.    Material Misrepresentations and Omissions

"When a securities plaintiff challenges a statement made by a defendant, plaintiff's mere usage of catchwords or bold assertions that defendant's statement was false or misleading because the defendant knew or must have known it to be false or misleading cannot lend support to plaintiff's claim." Intelligroup, 527 F.Supp.2d at 281 (citing, e.g., GSC Partners, 368 F.3d at 239  ("[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false"));.  Further,

> [Plaintiff's] mere second-guessing of [defendant's] calculations will not suffice; [the plaintiff] must show that [the defendant's] judgment-at the moment exercised-was sufficiently egregious such that a reasonable [person] reviewing the facts and figures should have concluded that [these facts or figures] were misstated and [in addition,] that ... the public was likely to be misled. [Securities] law does not expect clairvoyance.

Id. (quoting IKON Office Solutions, Inc., 277 F.3d 658, 673 (3d Cir. 2002); Suprema Specialities, Inc. Sec. Litig., 334 F.Supp.2d 637, 647 (D.N.J. 2004) ("Allegations that a company's later financial difficulties imply that earlier financial statements were untrue or misleading are 'fraud by hindsight' and do not state a claim") (citations omitted), rev'd on other grounds, 438 F.3d 256 (3d Cir. 2006)).

"When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak, [because a] duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." Chiarella v. United States, 445 U.S. 222, 235, (1980); Salovaara v. Jackson Nat. Life Ins. Co., 246 F.3d 289, 294 (3d Cir. 2001); Intelligroup, 527 F. Supp. 2d at 281. Furthermore,

-29-

> Silence, absent a duty to disclose, is not misleading under Rule 10b-5. Except for specific periodic reporting requirements ... there is no general duty on the part of a company to provide the public with all material information Such a duty to disclose may arise [only] when there is [an incident of] insider trading, [or presence of] a statute requiring disclosure, or [there was] an inaccurate, incomplete or misleading prior disclosure [requiring a corrective statement].

<u>Intelligroup</u>, 527 F. Supp. 2d at 282 (<u>quoting</u> <u>Oran v. Stafford</u>, 226 F.3d 275, 286-87 (3d Cir.2000)) (internal quotations omitted).

Under Rule 10b-5, it is unlawful to "'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.'" <u>Avaya</u>, 564 F.3d at 259 (quoting 17 C.F.R. § 240.10b-5(b)-©). The first requirement under the PSLRA is that a plaintiff specify with particularity each allegedly misleading statement, the reason or reasons why the statement is misleading, and if an allegation is made on information and belief, all facts supporting that belief. <u>Id.</u>; <u>see</u> 15 U.S.C. § 78u-4(b)(1); <u>Tellabs</u>, 127 S. Ct. at 2508; <u>Winer Family Trust</u>, 503 F.3d at 326. Defendants contend that Plaintiff's allegations are insufficient because they fail to demonstrate with sufficient particularity that Defendants' non-forward looking statements were false or misleading when made – i.e., "the reason or reasons why the statements are misleading." Specifically, Defendants take issue with the way Plaintiff has pled the allegedly misleading statements, the reliability of Plaintiff's confidential witnesses, and the sufficiency of the facts as pled in the Amended Complaint pursuant to Rule 9(b).

## A.    Identifying the Misleading Statements

For their first argument, Defendants reason that the Amended Complaint simply contains long block quotes of text from various press releases and conference call transcripts and then, in a general conclusory manner, provides a laundry list of vague reasons why those disclosures are allegedly false.  However, the Court finds the Amended Complaint sufficiently identifies the allegedly actionable statements.  In the section entitled "Defendants' Materially False and Misleading Statements Issued During the Class Period" of the Amended Complaint, Plaintiff alleges, in chronological order, the misleading statements made in each of Defendants' press releases, conference calls, and SEC filings.   While simply referring to a series of public statements as misleading is insufficient, see In re Party City Sec. Litig., 147 F.Supp. 2d 282, 300 (D.N.J. 2001), the long block quotes in this section containing the alleged misrepresentations are emphasized in bold and italicized text.  Moreover, following the allegations with respect to each of the press releases and conference calls, the Amended Complaint asserts reasons why the statements made therein were false or misleading – albeit the reasoning has not been sufficiently alleged as discussed below.  See, e.g., Am. Compl at ¶¶ 145, 157, 165.  The Amended Complaint also identifies who made the statements and when they were made.  See, e.g., ¶¶ 136-42, 144, 146-52, 156, 158-63, 166-69; see Silverman, 2008 U.S. Dist. LEXIS 76799 at *24 ("As we understand the complaint, plaintiffs are not alleging that the entire paragraphs are false, but only the

highlighted statements . . .").  Accordingly, the Court finds Plaintiff's first argument

on this issue unavailing.

### B.   Confidential Witnesses and the Sufficiency of the Pleadings

Plaintiff's claims in this action rest on the statements of twelve confidential

witnesses. <u>See</u> Amend. Compl. at ¶¶32-55, 82-102, 106-18, 124-34.  Defendants argue

that the statements made by the confidential witnesses are unreliable and thus, the

allegations relying on the statements provided by these witnesses do not sufficiently

meet the pleading requirements of a Section 10(b) claim.  In particular, Defendants

submit that the statements made by all the confidential witnesses should be

discounted because none of these low- and mid-level operational employees worked in

PharmaNet's finance department or otherwise had any involvement in the reporting

of PharmaNet's revenue, backlog, goodwill, or any other financial metric Plaintiff

alleges to be materially misstated.  More importantly, Defendants suggest that none

of the confidential witnesses was privy to any information relevant to Plaintiff's claims.

In response, Plaintiff maintains that the statements made by these witnesses are

reliable because all the necessary  information, i.e., time period, how the information

was obtained and when, with respect to each of the witnesses is adequately pled.

While a plaintiff in a securities fraud action can support a complaint through

confidential sources, statements from such sources can only be used:

> (1) if the complaint sets forth other factual allegations, such as
> documentary evidence, which are sufficient alone to support a fraud
> allegation, or (2) when the confidential sources are described in the
> complaint with sufficient particularity to support the probability that a

person in the position occupied by the [confidential] source would possess the information alleged.

Intelligroup, 527 F.Supp. 2d at 290 (internal citations omitted).  In order to satisfy this burden, "the complaint must disclose: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." Id. (citing Chubb, 394 F.3d at 146). Additionally, "allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail." Id. (citing Chubb at 146). Where these requirements are not met, courts must ignore the insufficiently described witness' statements for purposes of evaluating the plaintiff's allegations. Id.; Avaya, 564 F.3d at 263 ("[i]f [confidential] source allegations are found wanting with respect to these criteria, then [courts] must discount them steeply").

The Third Circuit's decision in Chubb provides guidance on this issue.  In Chubb, the Third Circuit affirmed the dismissal of a complaint where the plaintiffs relied on several confidential sources to corroborate allegations that the defendants knew of or recklessly disregarded accounting improprieties. 394 F.3d at 148-56. Those confidential sources were, as here, primarily former non-executive employees who provided neither data supporting their assertions nor credentials suggesting access to the company's relevant information. Id. at 152-53. In that regard, the court explained:

Plaintiffs fail to identify with particularity any source for their accounting fraud claims that would reasonably have knowledge supporting the allegations that Chubb's financial statements were false. Nor does the Second Amended Complaint identify the data, or source of data, used to arrive at its calculations. Nor do Plaintiffs provide any particulars regarding the amount by which reserves were distorted, or how much revenue was improperly recognized. Plaintiffs' allegations do not suffice.

Id. at 153-54 (citations omitted).  With this in mind, the Court turns to the parties' arguments.

Because the statements of each of these confidential witnesses are related and tied to a specific material misrepresentation or omission – i.e., backlog, revenue recognition, contract cancellations, and good will – the Court will discuss the reliability of the witnesses in those contexts.

## 1.    Cancelled or Delayed Contracts

Plaintiff alleges that PharmaNet's backlog was inflated because "contracts that Defendants had represented were postponed were actually cancelled or otherwise not likely to generate revenue within the foreseeable future."  The only contract, however, Plaintiff identified in connection with this allegation is the Pfizer osteoporosis study. Plaintiff complains that "PharmaNet had no reasonable expectation of when the osteoporosis project would begin in earnest," and that "the lengthy delay associated with the contract . . . was tantamount to a cancellation."  To support these allegations, Plaintiff relies on statements of CW4, CW7, CW3 and CW9.  Plaintiff alleges that CW9 and CW4 explained that the Pfizer osteoporosis contract was "pushed back" and

delayed and that work did not begin at any time during their tenure at PharmaNet.[18]
Am. Comp. at ¶¶ 91-92. Through discussions with colleagues at PharmaNet, CW4
learned that Pfizer was not giving Pharmanet the data it needed to perform endpoint
analyses on the new contract because Pfizer was upset with PharmaNet's performance
on a separate contract. Id. at ¶ 93. CW7 corroborated these statements and added
that CW7's immediate supervisor indicated to CW7 that he/she and "other senior
members of the Data Management team had been 'ridiculed' in meetings with their
superiors regarding the way in which data management tasks were handled on the
Pfizer projects." Id. at ¶ 94. CW12, a Pfizer executive, also stated that Pfizer would
not execute a contract – even though Plaintiff alleges that a contract was already
entered into with PharmaNet[19] – without fully negotiating the scope of work and that
"the mere fact a letter of intent may have existed between Pfizer and PharmaNet did
not necessarily mean that an executed contract was forthcoming." Id. at ¶ 112.
Plaintiff alleges that the Pfizer contract was not likely to be performed at the time the
contract was included in the backlog, and therefore, Defendants misled investors by
inappropriately including this contract in their financial projections.

[18]   PharmaNet did perform work on the Pfizer study, albeit not until February
2009. Amend. Compl. at ¶91-92

[19]   With regard to Pfizer's osteoporosis study, throughout the Amended Complaint,
Plaintiff alleges that PharmaNet had already entered into a contract with Pfizer to
perform the study. See Am. Compl. at ¶¶ 91, 93, 95. In fact, in its Opposition to
Defendants' motion, Plaintiff refers to the Pfizer "contracts." Pl. Opp. at pp.11-12.
However, Plaintiff alleges, inconsistently, in some parts of the Amended Complaint
that Pfizer never entered into a contract with PharmaNet to perform such a study,
but rather, Pfizer issued a letter of intent. See Am. Compl. at ¶¶ 110-111.
Regardless of this inconsistency, the Court's analysis remains the same because
PharmaNet's definition of backlog includes both contracts and letters of intent.

At the outset, the Court notes that none of the confidential witnesses indicated that Pharmanet actually included the Pfizer osteoporosis study, or any other Pfizer study, in PharmaNet's reported backlog.  Indeed, no documentary source –  press release, conference calls or SEC filing – indicate that the Pfizer study was included as part of PharmaNet's backlog reported to the public.  As alleged, CW7, CW4, CW9 and CW3 were not employed in a position to know which projects were included in reported backlog, or when the projects were added or removed  from backlog.  See, e.g., Am Compl. at ¶ 40 (CW3: a former marketing manager); ¶ 46 (CW7: Associate Data Analyst); ¶ 42 (CW4: a former senior endpoint management associate); ¶ 50 (CW9: a former clinical cardiovascular project manager); ¶ 55 (CW12: a Pfizer executive).  While Plaintiff alleges that these witnesses worked with high-level executives and participated in company-wide meetings, the information provided by these witnesses was not first-hand, because Plaintiff fails to allege the sources of this information – whether the information came from the Individual Defendants at these meetings, or any other executives, that had first hand knowledge of this information.  See Intelligroup, 527 F.Supp. 2d at 361 (discounting information provided by confidential witnesses who were "not providing firsthand information," but rather were repeating statements the witnesses heard).  Without these particularized allegations, the Court finds that statements that the Pfizer contract was included in the accounting of the reported backlog are speculative and conclusory.  See Chubb, 394 F.3d at 155

("[g]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standards of [the PSLRA]").

The allegations regarding Pfizer's contract fail to plead a material misrepresentation for the additional reason that throughout the Class Period, PharmaNet informed its investors that "backlog" included "anticipated direct revenue from written awards, letters of intent and contracts that either have not started or are anticipated to begin in the near future." See, e.g., Form 10-K filed on March 31, 2008 at 11. Moreover, PharmaNet disclaimed that "if clients delay projects, the project will remain in backlog, but will not generate revenue at the rate originally expected." More particularly, PharmaNet incorporated the following "cautionary statement" in its public disclosures:

> Contracts included in backlog are subject to termination by our clients at any time. In the event that a client cancels a contract, we would be entitled to receive payment for all services performed up to the cancellation date, and subsequent client-authorized services related to terminating the cancelled of the project. The duration of the projects included in our backlog range from a few weeks to many years. We cannot assure you that this backlog is indicative of future results. A number of factors may affect backlog, including:
>
> - the variable size and duration of the projects,
> - the loss or delay of projects,
> - the change in the scope of work during the course of a project, and
> - the cancellation of such contracts by our clients.
>
> Also, if clients delay projects, the projects will remain in backlog but will not generate revenue at the rate originally expected. Accordingly, historical indications of the relationship of backlog to revenues are not indicative of future results.

Id. Therefore, even if the Pfizer contract was included in the publicly disclosed backlog, such inclusion was not a material misrepresentation or omission because the cautionary statements accompanying the backlog in press releases and SEC filings sufficiently warned investors of such practice.[20]

### 2.  Unsigned Change Orders

Plaintiff also alleges that Defendants inflated PharmaNet's backlog by including future revenue from unauthorized change orders.  In support of this allegation, Plaintiff relies on the statements made by CW2 and CW3.  CW2 was an Assistant Director of Data Management Systems for PharmaNet from November 2006 through September 2008, see Am. Compl. at ¶36, and was responsible for developing project protocols for clients, including Pfizer, Inc. and Sanofi, which gave him access to information regarding data management systems, contract execution and negotiation, change order, billing and accounting practices, and staffing issues. Id. CW2 also participated in company-wide conference calls in which Defendants Hamill and McMullen often participated, as well as members of the Finance Department.  Id. at ¶37. During these conference calls, participating parties discussed the status of clinical

---

[20]   Plaintiff also takes issue with PharmaNet's pre-study work on the Pfizer project, alleging that "PharmaNet had ramped up expenses in order to perform contracts even though there was a substantial likelihood that contracts would be cancelled." Am. Comp. at ¶ 145.  However, the only contract that Plaintiff identifies in this regard is the Pfizer osteoporosis study, and Plaintiff acknowledges that work eventually commenced in 2009.  As such, this allegation is insufficient on a Section 10(b) claim because it amounts to essentially allegations of corporate mismanagement, which is not actionable.  See Avaya, 564 F.3d at 267 n.24.

trials, as well as "negative variances,"[21] which resulted from unsigned change orders. Id. at ¶83.  Plaintiff also alleges that CW2's position within PharmaNet allowed him to learn that Defendant Hamill was provided with reports which gave him constant updates on PharmaNet's financial performance. Id. at ¶39. In addition, Plaintiff alleges that because PharmaNet's legal department was "customarily" involved in contract cancellation disputes, and because the legal team did not dispute cancellations with customers without approval from PharmaNet's executives, that Defendants McMullen and Hamill must have known about these disputes. Id. at ¶85.

CW3 was employed as a Marketing Manager at PharmaNet's corporate headquarters in Princeton, New Jersey, from January 2001 through June 2008. Id. at ¶40. Through this position, CW3 was able to obtain information pertaining to business development, change orders and contract cancellations. Id. CW3 also worked closely with Andy Malavski, the Vice President of Marketing and a confidant of McMullen, and Michael Laird, Vice President of Late Stage Business Development. Id. CW3 was also present at PharmaNet's Annual Business Development Meetings in January 2007 and 2008, where PharmaNet's sales and business strategies were discussed, among other issues. Id. CW3 also knew Hamill, the members of his informational network, and his business practices as CFO. Id.  at ¶47. Through these various contacts, CW3 learned that McMullen and Hamill were informed daily of Business Development activities. Id. Specifically, CW3 alleges that "word came down" from the Business

---

[21]  "Negative Variances" refer to the degree to which actual work on a project diverged from the work that PharmaNet had budgeted or estimated at the commencement of a contract. (Amend. Compl. at ¶38).

Development team that Pfizer was not going to begin the clinical studies scheduled to begin during the first quarter of 2008, and that "there was no certainty as to when or if PharmaNet would even get the business." Id. at ¶115. CW3 explains that unnamed persons theorized that Pfizer was merely "dangling a carrot" of new business to discourage PharmaNet from suing over a cancelled Torcetrapib project. Id. at ¶116. CW3 further asserts that Defendant Hamill must have known about PharmaNet's alleged practice of recognizing revenue from unsigned change orders. Id. at ¶130.

Plaintiff alleges that both CW2 and CW3 confirmed that PharmaNet actually included revenue from unsigned change orders in its backlog, even though PharmaNet stressed that it did not. See Am. Compl. at ¶ 120 ("consistent with our conservative approach the value of the change order is not calculated in backlog or the revenue recognized until we have written authorization from the client"). According to CW3, during the first quarter of 2008, "the Finance department had to 'back out' of backlog a certain amount of revenue associated with unsigned change orders." CW2 confirmed this practice and explained that "PharmaNet had included in its backlog substantial revenue from unsigned change orders generated on Sanofi projects, which Sanofi had consistently refused to approve." Id. at ¶ 126. Plaintiff avers that CW2 learned about this practice in Data Management team meetings[22] that took place during the first quarter of 2008 as this issue was widely discussed in monthly meetings. Id. Moreover,

---

[22]   Although Plaintiff refers to meetings, it does not specify whether these meetings were in-person or conference calls.  Indeed, Plaintiff specifically alleges that CW2 participated in conference calls, not in-person meetings.  Am. Compl. at ¶ 37.

CW2 confirmed that "the $6.6 million decrease in direct revenue and $30 million in contract cancellations for the late-stage business that PharmaNet disclosed for its first quarter of 2008, are consistent with the amount of the change orders and the size of the cancelled contracts related to the Sanofi projects." Id. at ¶ 127.

The Court questions the bases of the confidential witnesses' knowledge of the information alleged. CW2 was an assistant director of data management in PharmaNet and CW3 was a marketing manager and therefore, neither of them had any involvement in the reporting or calculating of PharmaNet's backlog. As such, Plaintiff's allegations fail to set forth the bases – where they obtained their information – for their statements. While Plaintiff submits that CW2 learned about this type of practice in data management meetings where the issues of change orders were discussed, there were no allegations that identify with particularity from whom Plaintiff learned this information and whether such person(s) would reasonably have knowledge supporting the allegations that PharmaNet was inappropriately including unsigned change orders in its reported backlog. See Chubb, 394 F.3d at 153-54. Similarly, with respect to CW3, Plaintiff avers that by virtue of CW3's position as a marketing manager, CW3 was able to obtain information pertaining to business development, change orders and contract cancellations. However, without any specificity, Plaintiff alleges that CW3 confirmed that PharmaNet actually included revenue from unsigned change orders in its backlog. Plaintiff fails to allege whether CW3 obtained that information first-hand from reviewing PharmaNet's change orders

and backlog, or whether CW3 learned this information from some other source. Furthermore, Plaintiff does not allege how CW3 knew that the Finance Department had to "back-out" of backlog a certain amount of revenue associated with unsigned change orders.

Moreover, both witnesses, in a conclusory manner, stated that PharmaNet included revenue from unsigned change orders in backlog. While Plaintiff claims that CW2 confirmed – although Plaintiff does not explain how CW2 learned of this information – that the $6.6 million decrease in direct revenue and $30 million in contract cancellations were consistent with the amount of the change orders and the size of the cancelled contracts related to the Sanofi projects, the Amended Complaint fails to identify information showing that the unsigned change orders that were allegedly included in reported backlog had a material impact on PharmaNet's disclosures – such as, how much revenue supposedly was "booked" or "hit the books" improperly, and which books purportedly were hit, internal or external.  See Chubb, 394 F.3d at 154 ("the Seconded Amended Complaint [does not] identify the data, or source of data, used to arrive at its calculations. Nor do Plaintiffs provide any particulars regarding the amount by which reserves were distorted, or how much revenue was improperly recognized. Plaintiffs' allegations do not suffice"); See In re Burlington, 114 F.3d at 1417-18 ("where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, . . . plaintiffs [must] state what the unreasonable practices were and how they distorted

the disclosed data").  Without this type of information, these witnesses' statements qualify as only second-hand information, rumor, or speculation, which are not reliable. See Intelligroup, 527 F.Supp. 2d at 361.

Furthermore, allegations regarding PharmaNet's practice of recognizing revenue from unsigned change orders are equally insufficient.  Similar to allegations of utilizing unsigned change orders to inflate backlog, Plaintiff alleges that Defendants violated accounting policies by recognizing revenue associated with unsigned change orders and thereby inflating their reported revenue.  For support, Plaintiff relies on the statements of CW3 and CW11.

CW11 was employed by PharmaNet as an Assistant Project Manager from 2001 until March 2008, during which time CW11 was responsible for assisting in the management and administration of assigned projects by Pfizer and Sanofi.  See Am. Compl. at ¶ 52.  CW11 was also a member of the Technology Group, where he had access to information regarding change orders. Id. CW11 also participated in weekly Project Management meetings, where CW11 obtained information pertaining to PharmaNet's unsigned change orders and billing practices, as well as contract cancellations. Id. at ¶ 53.  Specifically, CW11 alleges that the Business Development and Project Management personnel were skeptical as to when the anticipated Pfizer contract would begin. Id. at ¶ 118. CW11 was also confident that because "Individual Defendants surrounded themselves with a tight-knit group of advisors," that they must

have known that Project management was trying to get revenue from unsigned change-orders "off the books." Id. at ¶ 129.

Plaintiff avers that CW11, through routine interaction with the Finance Department, learned that "PharmaNet actually recognized revenue associated with unsigned change orders as a matter of common practice." Am. Compl. at ¶ 128. CW11 also stated that "the Finance Department typically booked revenue associated with all unsigned change orders regardless of whether PharmaNet actually billed the customers for the work." Id. CW11 "suspected that the Company's practice of recognizing revenue from unsigned change orders propped-up its results that year, but that management sought to "clean it up" before year-end." Id. at ¶ 129 (emphasis added). Further, CW11 "surmised that the Company may have also made accounting adjustments that reduced revenue for the first quarter of 2008, resulting in the Company's "hit" for the quarter." Id. (emphasis added). Plaintiff alleges that CW3 corroborated this information and added that "the Finance Department was so hungry for revenue that it 'booked' revenue from change orders without first obtaining customer signatures." Id.

These allegations of misleading company practices are unspecific. "To adequately plead financial fraud based on improper revenue recognition, Plaintiff must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, when the transaction occurred, and the approximate amount of the fraudulent transaction." In re Oak Tech, Sec. Litig., No.

96-20552, 1997 U.S. Dist. LEXIS 18503, at *23 (N.D.Cal. Aug. 1, 1997); In re Milestone Scientific Sec. Litig., 103 F.Supp. 2d 425, 473 (D.N.J. 2000); Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 278 (D. Mass. 1998).  Here, Plaintiff does not allege the amount by which revenues were overstated as a result of the alleged improper revenue recognition.  Nor does Plaintiff indicate any particular unsigned change orders that were improperly recognized as revenue. This vagueness is exemplified by CW11's statement that PharmaNet improperly recognized revenue from "probably every client [PharmaNet] had." Am. Compl. at ¶ 128.  While Plaintiff alleges that CW11 identified Sanofi as a customer whose unsigned change orders were included in PharmaNet's revenue, Plaintiff fails to allege how much of the unsigned change orders relating to Sanofi were included in PharmaNet's revenue and whether those change orders had a significant impact on PharmaNet's disclosures to the general public.

Moreover, there are no allegations of how CW3 - a marketing manager - and CW11 - an assistant project manager – would have had access to the information they provided.  Therefore, Plaintiff fails to allege the bases for these witnesses' knowledge.  Instead, Plaintiff alleges that CW11 obtain this information "[t]hrough routine interaction with the Finance Department and from tracking change orders.  However, Plaintiff fails to allege any of the following information: (1) from whom in the Finance Department (a specific person) or what reports (a specific document) CW11 obtained the information; (2) how CW11's source obtained that information; (3) when CW11 received it; and (3) how much revenue was fraudulently inflated.  Likewise, the fact

that CW11 was tracking unsigned change orders is not sufficient without other allegations of how those unsigned change orders were included or excluded from PharmaNet's revenue.  More importantly, even according to the words of the Amended Complaint, some of CW11's statements were mere speculation.  <u>See</u> Am. Compl. at ¶ 129.  Without these allegations, the Amended Complaint fails to provide an adequate basis of knowledge for CW11's or CW3's statements.  <u>See, e.g.</u>, <u>In re Nice Sys. Sec. Litig.</u>, 135 F. Supp. 2d 551, 572-73 (D.N.J. 2001) (stating that information and belief allegations that fail to identify the source of information do not satisfy the PSLRA's requirements); <u>Avaya</u>, 564 F.3d at 253 (stating that plaintiffs must "plead the who, what, when, where, and how; the first paragraph of any newspaper story").  As such, these statements regarding improper recognition of unsigned change orders as revenue are unreliable.

### 3.      Cancelled Contracts Due to Poor Performance

Plaintiff alleges that McMullen's statements that the contract cancellations in the fourth quarter of 2007 and first quarter of 2008 were not connected to PharmaNet's performance were false and misleading because the real reason for the cancellations was "dissatisfaction with Pharmanet's performance."  Plaintiff only identifies by name, one customer, Sanofi, that cancelled its contract with PharmaNet because of performance issues. In that respect, relying on several confidential witnesses' statements, Plaintiff alleges in general that "PharmaNet engaged in a widespread practice of under-budgeting project work in order to obtain contract awards, which

later resulted in the Company's issuance of change orders for additional work." Am. Compl. at ¶ 82.   CW2 indicated that a "large problem associated with these practices occurred in connection with a project that Sanofi had outsourced to PharmaNet, which resulted in Sanofi's cancellation of the contract and refusal to pay a substantial amount of change orders during the fourth quarter of 2007." Id.  CW2 also indicated that the Sanofi contract "was worth between $20 million and $30 million and was expected to contribute to the backlog for two to three years," but Sanofi cancelled the contract during its first year. Id. at ¶ 85.  Plaintiff goes on to allege that two of the confidential witnesses – CW1[23] and CW5 – confirmed that Sanofi pulled business from PharmaNet during the fourth quarter of 2007. Id. at ¶ 87.  CW1, through conversations with former colleagues at Quintiles, a competitor of PharmaNet, learned that "Sanofi referred the business that it pulled from PharmaNet to Quintiles." Id. at ¶ 88.

As for the reasons for the pull-out, CW1 explained that "the source of the dispute between Sanofi and PharmaNet involved a large number of unpaid change orders, which CW1 believed were generated by multiple PharmaNet offices and 'went unsigned for months' before Sanofi pulled the underlying projects. Id. at ¶ 89.  However, in the entire Amended Complaint, Plaintiff only identifies one witness, CW11, who related customer cancellations to poor PharmaNet performance, stated only in a conclusory manner that Sanofi cancelled several projects as a result of "PharmaNet's poor performance." Id. at ¶ 90.

---

[23]   CW1 was employed by PharmaNet as a Data Services Group Leader from February 2006 through March 2008. Id. at ¶33.

Having reviewed the allegations, the Court finds that Plaintiff fails to allege sufficiently that the reasons Sanofi cancelled projects with PharmaNet were based upon poor performance.  Plaintiff alleges that McMullen repeatedly stated that cancelled contracts were not due to performance issues and they were not referred to competitors.  See Am. Compl. at ¶¶ 150, 160, 161.  Indeed, McMullen made the following statement in response to an inquiry whether any of the contract cancellations were performance related or competitive losses:

> They were not performance related.  As I've said, one of them is – has resulted from a contract dispute and that has an impact of about $900,000 on this year.  So it's related to a relationship with a client that's not going well.  It's not – performance on the project is actually – was actually quite good.  And we were told that.  But we have a contract dispute.

Defendants' Q4 2008 Guidance Call Transcript at 11.  CW11 did not state what specifically were the performance issues or who CW11's sources were for this information.  Rather, the allegations plainly suggest that Sanofi cancelled contracts with PharmaNet because of disputes concerning the scope of the projects and resulting change orders.  See Am Compl. at ¶¶ 82, 85, 89.[24]

---

[24]   CW8, a former regulatory affairs coordinator who was employed as a member of PharmaNet's regulatory affairs team from September 2007 through March 2008, indicated that GlaxoSmithKline and Sumitomo expressed dissatisfaction with PharmaNet's regulatory services and staffing on projects.  See Am. Compl. at ¶¶ 97-102.  However, Plaintiff did not allege that these two customers cancelled their contracts with PharmaNet.  Instead, Plaintiff alleges that GSK and Sumitomo likely have cancelled their contracts because they were allegedly extremely dissatisfied with PharmaNet, and that GSK had threatened to pull its contract because PharmaNet had failed to complete "a lot of regulator work."  Id. at ¶¶ 99, 101.  Because GSK and Sumitomo are not alleged to have in fact cancelled their contracts, the allegations involving these entities are insufficient to support Plaintiff's claim that PharmaNet misrepresented that customers were not

With respect to allegations that McMullen denied that none of the cancelled contracts were referred to other competitors, Plaintiff also fails to allege them with specificity. Relying on CW1's statement, Plaintiff alleges that CW1 learned that Sanofi referred the business that it pulled from PharmaNet to Quintiles from conversations with "former colleagues" at Quintiles. However, this type of secondhand information is not reliable without specific allegations pertaining to the source of this information (the source's role at Quintiles); how CW1's source obtained this information; whether Individual Defendants had knowledge of this information; and which Sanofi project was supposedly pulled from PharmaNet and referred to Quintiles. In this regard, CW1's statement is insufficient and does not meet the requisite particularity.[25]

### 4.    Impairment Charge to Goodwill

Plaintiff alleges that Defendants violated a host of General Accepted Accounting Principles ("GAAP") provisions because Defendants "failed to timely record an impairment of goodwill and indefinite-lived assets after the occurrence of events during the Class Period that alerted Defendants to the substantial likelihood that the value of these assets was impaired," and that PharmaNet failed to perform a review of whether an impairment charge was necessary. See Am. Compl. at ¶ 203. According

---

dissatisfied with PharmaNet's performance.

[25]    Plaintiff also takes issue with Defendants' statement regarding PharmaNet's "health and prospects" in the November 2007 disclosures because mounting customer dissatisfaction would contribute to the cancellation of contracts and customer refusal to sign change orders. Am. Compl. at ¶ 145. However, Plaintiff never identifies any customers that actually pulled contracts from PharmaNet due to performance issues, except for Sanofi, which the Court has addressed. In that respect, Plaintiff's allegations lack the required particularity.

to Plaintiff, it was not until October 30, 2008, in a press release, that Defendants finally disclosed to the market that PharmaNet might have to record a non-cash impairment charge to good will as a result of a decrease in PharmaNet's market capitalization. Id. at ¶ 200. Plaintiff alleges that Defendant's failure to announce this impairment charge at an earlier time assisted in concealing from the market PharmaNet's true financial condition.

Again, these allegations are insufficient.  Other than complaining that Defendants were untimely in disclosing the impairment charge to good will, Plaintiff never alleges how much earlier, in accordance with GAAP, PharmaNet should have recorded the impairment charge or how much the charge should be.  Plaintiff fails to sufficiently allege any facts, such as actual knowledge on the part of the Defendants of PharmaNet's misconduct, that would give rise to a duty to make an impairment charge.  Furthermore, PharmaNet's disclosure appears to comport with its representations about its methods for recognizing impairments. PharmaNet's 2007 Form 10-K states that PharmaNet "perform[s] an annual test for impairment of goodwill and other indefinite-lived intangible assets during the fourth quarter, or more frequently if impairment indicators arise during the year."  In fact, PharmaNet performed this impairment test in the third quarter of 2008, in advance of its customary annual review, because of declines in PharmaNet's market capitalization, see Am. Compl. at ¶200.  In its third-quarter 2008 Form 10-Q, Defendants disclosed that PharmaNet recorded a non-cash impairment charge to goodwill and indefinite-

lived assets in the amount of $210.6 million for the third quarter of 2008.  Id. at ¶201.
In its 2008 Annual Report, Defendants disclosed that PharmaNet took an additional
$37.9 million charge to goodwill and indefinite-lived assets for the fourth quarter of
2008.  Id. at ¶202.  In sum, Plaintiff's allegations in this context also fall short of
complying with the pleading requirements of PSLRA.[26]

    As a final note, while the Court finds that these confidential witness statements
are not pled with the requisite particularity, the Court is not suggesting that these
witnesses could not have possessed first-hand knowledge of the allegations in the
Amended Complaint, simply because of their positions within PharmaNet. Rather,
Plaintiff has not alleged adequately that these statements are reliable under the
PSLRA; to be reliable, Plaintiff must identify the specific source of the witnesses'
information ("where" and "who"), and how this information connects to the alleged
misrepresentations ("what" and "when").

---

[26]    Plaintiff posits that despite Rule 9(b)'s stringent requirements, the Court
should be sensitive to the fact that application of the Rule prior to discovery may
permit sophisticated defrauders to successfully conceal the details of their fraud.  As
such, Plaintiff submits that the Court should relax Rule 9(b)'s standard because the
full extent of the fraud is exclusively within Defendants' knowledge.  Contrary to
Plaintiff's position, Plaintiff has failed to allege that any of this information is not
available to Plaintiff, if in fact the information exists. Plaintiff is therefore not
entitled to a "relaxed" pleading standard. See Shapiro v. UJB Fin. Corp.. 964 F.2d
272, 285 (3d Cir. 1992) (stating that plaintiffs must "at the very least" allege that
the information needed to be pled with particularity lies within defendants'
exclusive control and describe "the nature and scope of plaintiffs' efforts to obtain"
such information before filing the complaint); see also Jones v. Intelli-Check, Inc.,
274 F. Supp. 2d 615, 629 (D.N.J. 2003).

## IV.   Scienter

"Scienter" means "a mental state [of] intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976).   Under the PSLRA's second pleading requirement, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Avaya, 564 F.3d at 267 (quoting 15 U.S.C. § 78u-4(b)(2)).   This scienter standard requires plaintiffs to allege facts giving rise to a "strong inference" of "either reckless or conscious behavior." Advanta, 180 F.3d at 534-35.   Courts must weigh the "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." Tellabs, 127 S. Ct. at 2510.

A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 2504-05; see also Id. at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences" (internal quotation marks omitted)). The pertinent question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 2509.  Omissions and ambiguities "count against inferring scienter." Id. at 2511.

### A.   Motive and Opportunity

Here, Plaintiff argues that several alleged motives, in the aggregate, meet the scienter requirement: insider trading; funding the SFBC Settlement; funding

-52-

PharmaNet's "grow-by-acquisition" strategy; replaying or converting $143.8 million in convertible notes; and assuaging the concerns of investors, analysts and clients that PharmaNet could not adequately service current business or win new contract awards.

However, contrary to Plaintiff's assertion, in light of the decision in Tellabs, the Third Circuit in Avaya rejected the approach as sufficient to prove scienter, absent references to all the allegations in the complaint.  Instead, the circuit court held that:

> Congress chose neither to adopt nor reject particular methods of pleading scienter--such as alleging facts showing motive and opportunity--but instead only required plaintiffs to plead facts that together establish a strong inference of scienter. We find this position persuasive. . . . The text of the statute states only that the complaint must support "a strong inference" of scienter. Without more detailed instruction, we conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

Avaya, 564 F.3d at 276 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs I), 437 F.3d 588, 601 (7th Cir. 2006)) (internal quotation marks and citations omitted), rev'd on other grounds, 551 U.S. 308 (2007).  Moreover, "[i]f the significance of the presence, or absence, of motive allegations can be ascertained only by reference to the complete complaint, then a general rule that motive allegations are sufficient--or necessary--is unsound."  Id. at 277.

The court further elucidated:

> Individuals not infrequently have both strong motive and ample opportunity to commit bad acts--and yet they often forbear, whether from fear of sanction, the dictates of conscience, or some other influence. It cannot be said that, in every conceivable situation in which an

> individual makes a false or misleading statement and has a strong
> motive and opportunity to do so, the nonculpable explanations will
> necessarily not be more compelling than the culpable ones. And if that
> is true, then allegations of motive and opportunity are not entitled to a
> special, independent status. Instead, . . . they are to be considered along
> with all the other allegations in the complaint.

Id. Accordingly, here, Plaintiff's allegations of motive and opportunity, standing alone,

are insufficient to meet the requirement of scienter.  Rather, the Court will analyze

these motives, together with the entire Amended Complaint, to determine whether

scienter has been properly pled with particularity.

Furthermore, in establishing motive and opportunity, a plaintiff should

"demonstrate a logical connection between the alleged fraud and motive in order to

establish a reasonable inference of fraud: plaintiffs' allegations as to defendants'

motive to defraud investors with respect to a certain matter cannot be matched with

plaintiffs' facts that defendants committed fraud with respect to another matter."

Intelligroup, 527 F. Supp. at 283-84.  Plaintiff must therefore plead that Defendants:

(1) "benefitted in a concrete and personal way from the purported fraud;" (2) "engaged

in deliberately illegal behavior;" (3) "knew facts or had access to information

suggesting that their public statements were not accurate;" or (4) "failed to check

information they had a duty to monitor."  Id. at 284 (quoting Novak v. Kasaks, 216

F.3d 300, 311 (2d Cir.2000)); see Wilson v. Bernstock, 195 F. Supp. 2d 619, 633 (D.N.J.

2002) ("'Motive entails allegations that the individual corporate defendants stood to

gain in a concrete and personal way from one or more of the allegedly false or

misleading statements and wrongful nondisclosures. . . . [M]otive and opportunity 'like

all other allegations of scienter must now be supported by facts stated with particularity and must give rise to a strong inference of scienter'") (quoting Advanta, 180 F.3d at 535)); In re Cybershop.com Sec. Litig., 189 F. Supp. 2d 214, 234-35 (D.N.J. 2002).

### 1.    Insider Trading

Plaintiff relies on the theory that McMullen and Hamill (who did not sell any PharmaNet stock during the class period but rather retained their holdings), engaged in a fraudulent scheme to inflate PharmaNet's stock price to benefit three former PharmaNet executives, none of whom are defendants in this action or were employed by PharmaNet at the beginning of the Class Period, or at the time of their alleged insider stock transactions.

Plaintiff, at length, alleges that during the Class Period, three alleged insiders collectively "sold millions of dollars of their personally-held common stock at artificially inflated prices while in possession of undisclosed adverse information, and exercised options to purchase stock at far lower prices than such shares could have been acquired on the open market." Am. Compl. at ¶ 206.  These insiders, David Natan; Jack Levine; and David Lucking, were affiliated with PharmaNet in their official capacities until late-October and early November 2007.  Id. at ¶ 207.  Included in the Amended Complaint are charts and graphs that show the activities of these alleged trades, which occurred during the Class Period.  See Id. at ¶¶ 209-211.

Aside from these allegations, Plaintiff does not allege that the Individual Defendants sold any PharmaNet stock or engaged in any type of insider trading during the Class Period.[27] Rather, Plaintiff argues that the Individual Defendants do not have to personally benefit from the alleged fraud; it is sufficient that former top executives of PharmaNet, i.e., Natan, Levine and Lucking, sold stock during the Class Period. Put differently, Plaintiff argues that because the sale of the former executives' stock coincided with the time when Defendants made the allegedly false and misleading statements, the Court should find a strong inference of scienter. Plaintiff cites to cases that do not support its position. See In re Westell Techs., Inc. Sec. Litig., No. 00-6735, 2001 U.S. Dist. LEXIS 17867, at *37-38 (N.D. Ill. Oct. 26, 2001) (finding that there was strong independent evidence against only one defendant, where only four of the six named defendants sold significant holdings in the company during the class period); Brumbaugh v. Wave Sys. Corp., 416 F.Supp. 2d 239, 254 (D. Mass. 2006) (finding that plaintiff had sufficiently pleaded a strong inference of scienter where two of individual defendants sold 50% and 20% of their holdings, respectively).

Standing alone, the allegations that these three former executives sold their stocks during the Class Period do not establish scienter on the part of McMullen or Hamill. See In re Century Bus. Svcs. Sec. Litig., No. 99-2200, 2002 WL 32254513, at

---

[27]    It is not disputed the Individual Defendants did not sell shares of PharmaNet stock during the Class Period, they retained and accumulated significant PharmaNet shares during the Class Period and thus, sustained economic losses when the stock price dropped. See Defendants' Exs. 21 -27 (these Exhibits are various Form 4s filed with the SEC regarding changes in beneficial ownership of securities).

*7 n. 18 (N.D. Ohio Jun. 27, 2002) ("Since these individuals all are non-defendants . . . the Court does not consider these sales probative of the defendant's scienter"); see also In re First Union Corp., 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001) (allegations regarding stock sales by a former board chairman, who was not named as a defendant are "curious and unavailing"); Plevy v. Haggerty, 38 F. Supp.2d 816, 834 n.12 (C.D. Cal. 1998) ("[non-defendants] transactions are irrelevant to alleging scienter against the five named Defendants" and their inclusion in the complaint is "misleading"). Accordingly, the Court finds that because the Individual Defendants did not sell their stock during the Class Period, there is no strong inference of scienter.  See Advanta, 180 F.3d at 540 (stating that allegations of motive are doubtful where some defendants did not sell stock); In re Burlington, 114 F.3d at 1423-24.

### 2.    SFBC Settlement and Other Business-Related Motives

Plaintiff also alleges that McMullen and Hamill were motivated to commit the fraud "in order to induce and maintain PharmaNet's artificially inflated stock price, which they intended to use to partially fund the Settlement of a consolidated securities class action . . . ."  Am. Compl. at ¶ 221.  In particular, Plaintiff alleges that "[o]n August 1, 2007, several months prior to the beginning of the Class Period, PharmaNet announced that it had settled the class action for $28.5 million, a portion of which the Company and certain of its directors and officers were personally responsible to cover outside of insurance and payments by other defendants."  Id. at ¶ 222. Plaintiff further alleges that "[b]y the beginning of 2008, PharmaNet was already feeling the effects of

having to fund its portion of the Settlement account in cash: on December 11, 2007 and January 11, 2008, PharmaNet made a total of $4 million in cash payments to the shareholder plaintiffs' escrow account in connection with the Settlement." Id. at ¶ 223.

On March 10, 2008, the Settlement was approved, and on March 24, 2008, PharmaNet's obligations under the Settlement came due. Id. at ¶ 224. Subsequently, PharmaNet issued 135,870 shares of common stock valued at $4 million, or $29.44 per share, to satisfy its obligation. This pricing was based on the volume weighted average closing price of PharmaNet stock for the ten trading days leading up to the date the district court entered the order formally approving the settlement – March 10, 2008 (i.e. the closing price from February 25 to March, 7, 2008). Id. at ¶ 224 n.12. Plaintiff then alleges that "Defendants ensured that the Company's share issuance would occur before the public disclosure of adverse news, which they expected to, and did, instantly cause a precipitous decline in the stock price." Id. at ¶ 225. Plaintiff claims that "[h]ad PharmaNet's stock price declined to its post Class Period levels by the time that its payment came due . . . the Company would have had to issue a far greater number of shares to make up for the decrease in value." Id. at ¶ 226.

Plaintiff's allegations do not establish any clear motive. Plaintiff suggests that Defendants manipulated the disclosure date of adverse news in order to inflate the price of PharmaNet's stock. This seemingly contradicts Plaintiff's allegations that three days into the relevant time period when the stock price was determined for the purposes of funding the Settlement (February 28, 2008), PharmaNet disclosed

"increasing contract cancellations and decreasing backlog for the fourth quarter and

year-end of 2008 [sic]," which allegedly caused PharmaNet's stock price to drop $12.73

to $28.62 per share.  Id. at ¶ 214.  The fact that Defendants disclosed adverse

information during the relevant time period casts serious doubt on Plaintiff's assertion

that the Individual Defendants acted with an illegal motive – inflating PharmaNet's

stock for the purpose of funding the SFBC Settlement.

Plaintiff's allegations regarding Defendants' motive to inflate the stock price so

as to fund the Settlement also fail for the additional reason that there is no allegation

that the Individual Defendants personally benefitted from inflating PharmaNet's stock

for this purpose; rather, this is a type of general business motive.  In fact, the

remainder of the motives alleged by Plaintiff also qualify as ordinary business motives.

These motives are summarized as follows: (1) to fund PharmaNet's "growth-by-

acquisition" strategy;[28] (2) to repay or convert $143.8 million in convertible notes;[29] and

(3) to assuage the concerns of investors, analysts and clients that PharmaNet could not

adequately service current business or win new contract awards, while at the same

---

[28]    Plaintiff does not identify any acquisition by PharmaNet during the Class
Period, and the allegations referring to acquisitions are vague.  In re CDNOW, Inc.
Sec. Litig., 138 F. Supp. 2d 624, 642 n.22 (E.D. Pa. 2001) (holding that allegations
of scienter failed where the allegations of using stock for mergers were vague and
general); Coates v. Heartland Wireless Comm., Inc., 26 F. Supp. 2d 910, 919 (N.D.
Tex. 1998) (mere allegation that company was motivated to inflate stock price
"because it was expanding through acquisition of other systems and companies and
was primarily paying for those acquisitions with [the company's] common stock"
failed to establish scienter).

[29]    See Key Equity Investors Inc. v. Sel-Leb Mktg., 246 Fed. Appx. 780, 786 n.10
(3d Cir. 2007) (defendants' alleged motive to fraudulently misstate earnings because
they needed a line of credit to operate is "nothing more than an ordinary business
motive, which is typically insufficient to support a strong inference of fraud").

time maintaining a facade that PharmaNet has shed the practices for which its predecessor was reputed.[30]

These allegations alone are insufficient to plead a clear motive, because Plaintiff cannot allege that Defendants had goals or aspirations not common to the business community for the purposes of showing scienter. Intelligroup, 527 F.Supp. 2d at 284; (citing GSC, 368 F.3d at 237 ("Motives that are generally possessed by most corporate directors and officers do not suffice") (internal quotations omitted)); Wilson v. Bernstock, 195 F.Supp. 2d at 634 ("'[A] company's desire to maintain a high bond or credit rating [is an insufficient motive for fraud] . . . because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions'") (quoting San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir.1996)); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068 (5th Cir.1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated") (citation omitted); Nice, 135 F. Supp. 2d at 584 ("[T]he allegation that [d]efendants made false and misleading statements to secure market share is ... insufficient to demonstrate that [d]efendants had a motive to commit fraud"); In re Boeing Sec. Litig., 40 F.Supp.2d 1160, 1175

---

[30]   See Guerra v. Teradyne Inc., No. 01-11789, 2004 U.S. Dist. LEXIS 28548, at *80 (D. Mass. Jan. 16, 2004) ("courts generally conclude that the general motive 'of maintaining the stock price in order to maintain the reputation of the company and facilitate mergers and acquisitions' is insufficient to satisfy the scienter requirement since 'such motives can be ascribed to virtually all corporate officers and directors . . .'") (quoting Malin v. Ivax Corp., 17 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998), aff'd, 226 F.3d 647 (11th Cir. 2000)).

(W.D. Wash.1998) ("[T]he desire to . . . remain profitabl[e] is a generic motive that fails to satisfy the heightened pleading standards for scienter under the PSLRA"); In re Ravisent Techs., Inc. Sec. Litig., No. 00-1014, 2004 U.S. Dist. LEXIS 13255, at *41 (E.D Pa. Jul. 12, 2004) ("'general claims that officials sought to inflate the price of common stock to 'protect, perpetuate and enhance their executive positions' alleges a motive generic to all corporate officials . . .'"(citations and quotations omitted)); Plaintiff therefore cannot, without more, rely on allegations that amount to circumstances constituting legitimate business motives to establish an inference of scienter.

Moreover, Plaintiff's reliance on In re Cabletron Sys. Inc., 311 F.3d 11, 39 (1st Cir. 2002), is misplaced.  In that case, the First Circuit held that allegations of "concealment of the serious and worsening deterioration of Cabletron's financial health [was] a significant motive for the alleged fraud." Id.  However, in so doing, the court found that there were allegations that the executives committed securities fraud because their careers and the very survival of the company were on the line, and  that these motivating fears were realistic.  Id.  Based on allegations of this magnitude, the court concluded that this is more than the usual concern by executives to improve financial results.  Cf. Nathenson v. Zonagen, Inc., 267 F.3d 400, 425 (5th Cir. 2001) (finding strong inference of scienter for misstatements about patent was supported by the fact that company's future depended on patent).  Here, Plaintiff simply fails to allege with specificity that during the Class Period Defendants were faced with such

serious financial problems that the Individual Defendants  were concerned about an imminent collapse of PharmaNet, or that they were likely to lose their positions at PharmaNet.  Rather, with respect to these business motives, Plaintiff alleges facts that simply demonstrate Defendants were facing a garden variety of normal business concerns.

### B.    Circumstantial Evidence of Conscious Misbehavior or Recklessness

Plaintiff further argues that scienter can be inferred from the Individual Defendants' conscious misbehavior and recklessness.  A plaintiff alleging a strong inference of scienter from circumstantial evidence must sufficiently plead "defendants' knowledge of facts or access to information contradicting their public statements. . . . [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 599 (D.N.J. 2001).  However, where plaintiffs "choose to establish[] scienter . . . by asserting circumstantial evidence of intent or recklessness, 'the strength of the circumstantial allegations must be [even] greater.'" Intelligroup, 527 F.Supp. 2d at 285 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).  The allegations of circumstantial evidence must be supported by detailing, with particularity, "the who, what, when, where and how" of the events at issue and present clear facts verifying plaintiff's deductions with respect to defendant's state of mind. Burlington, 114 F.3d at 1422 (citation omitted); see also Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001) (finding that a temporal proximity of events, standing

alone, is insufficient circumstantial evidence). Moreover, the totality of circumstantial facts alleged must give rise to an inference of scienter "at least as compelling as any opposing inference one could draw from the facts." <u>Tellabs</u>, 127 S. Ct. at 2510.

"Conscious misbehavior is alleged by 'stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.'" <u>Aviva Partners LLC v. Exide Techs.</u>, No. 05-3098, 2007 U.S. Dist. LEXIS 17347, at *26 (D.N.J. Mar. 13, 2007) (quotations omitted). Recklessness is conduct that represents "an extreme departure from the standards of ordinary care . . . which represents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." <u>Suprema</u>, 438 F.3d at 276.  Again, the key inquiry is whether "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." <u>Campbell Soup</u>,145 F. Supp. 2d at 599 (quotations omitted).

Plaintiff argues that it sufficiently alleges reckless and conscious misbehavior on the part of the Individual Defendants based upon statements made by the confidential witnesses, the Individual Defendants' high-ranking positions within PharmaNet, and the business core doctrine.  According to Plaintiff, the foregoing demonstrate that McMullen and Hamill had the requisite knowledge of the alleged fraud to give rise to a strong inference of scienter.

### 1. Confidential Witnesses

As stated, supra, in order to rely on the statements of a confidential witness, even for the purpose of pleading scienter, the plaintiff must allege: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access  to the information.  Intelligroup, 577 F.Supp. 2d at 290 (citations omitted); Portal Software, Inc. Secs. Litig., No. 03-5138, 2005 U.S. Dist. LEXIS 20214, at *28 (N.D. Cal. Aug. 10, 2005) ("[P]laintiffs must describe the job title, job description, duties, and dates of employment for the controller's sources before this information can be deemed reliable").  Moreover, in Chubb, the Third Circuit cautioned that allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail.  See Chubb, 394 F.3d at 146.  Indeed, "failure to meet these requirements with respect to each and every confidential source the plaintiff relies upon, renders that source irrelevant for the purposes of plaintiff's allegations."  Intelligroup, 577 F.Supp. 2d. at 290; see Chubb, 394  F.3d at 146. "The sheer volume of confidential sources cited cannot compensate for these inadequacies . . . . Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA."  Chubb, 394 F.3d at 155.

Plaintiff argues that all twelve confidential witnesses have confirmed that the Individual Defendants knew or should have known about the most material aspects of the alleged misrepresentations and omissions.  However, pleadings in the Amended Complaint paint a different picture; the witnesses' statements do not sufficiently support the fact that the Individual Defendants had knowledge of the alleged fraud. For example, regarding the Sanofi contract cancellations, Plaintiff alleges that CW2 confirmed that "unsigned change orders, and the negative variance they caused were ongoing subjects of the company-wide meetings that took place on the Wednesday of each month, in which the Individual Defendants participated and each individual project was discussed." Am. Compl. at ¶ 83.  In this allegation, scienter clearly has not been sufficiently alleged. While CW2 stated that McMullen and Hamill spoke about unsigned change orders, Plaintiff does not allege that McMullen and Hamill knew that the change orders at issue - pertaining to Sanofi specifically - were included in the backlog.  In fact, Plaintiff then alleges that "CW2 had 'no doubt' that each of the Individual Defendants was well informed of the situation involving Sanofi." Id.  This again does not sound in first-hand knowledge

Regarding the same Sanofi project, Plaintiff alleges that CW3 shared CW2's belief that the CEO would know about cancellation disputes, and further that both of the Individual Defendants would typically be involved early in the process. Id. at ¶ 86. According to CW3, "the Company's Business Development and Finance Departments generally notified the Individual Defendants about any business losses." Id. (emphasis

added). This allegation suffers from the same deficiency – Plaintiff fails to allege that McMullen and Hamill had knowledge or should have known that any cancelled contracts were included in the backlog, and to the extent that these allegations suggest that the Individual Defendants knew of the alleged illegal commercial practices, it is speculative at best.  The following allegation suffers from the similar flaw: ¶ 89 ("CW1 also believed, like CW2 and CW3, that the Individual Defendants were aware of problems involving Sanofi contracts, because according to CW1, one of the remaining studies <u>may</u> have been relocated to . . . Princeton . . . so that the senior executives could monitor it more closely") (emphasis added); ¶ 54 ("CW 11 also explained that the Individual Defendants had knowledge of all these issues because Newman and Gill, two senior executives who reported to the Individual Defendants and consulted with them regularly throughout each week, attended all Project Management meetings"); ¶ 129 ("CW11 <u>was confident</u> that [executives] . . . generally – knew about these [illegal] practices") (emphasis added); <u>see</u> <u>also</u> ¶¶ 37-38 (same).

Moreover, with respect to the alleged practice of including unsigned change orders in the backlog, Plaintiff alleges that Hamill must have had knowledge of the practice because, as the CFO, he "ran the Finance Department and [was known] to be directly involved in all of the Company's accounting and finance decisions," and that "CW3 <u>believed</u> that the Finance Department would not aggressively pursue change orders without his knowledge or authorization." <u>Id.</u> at ¶ 130 (emphasis added).  In addition, CW3 also stated that McMullen, as CEO, also must have known about these

practices.  Id.  These allegations are conclusory because CW3's "belief" that McMullen

and Hamill must have known about the alleged fraudulent practices is only based upon

the Individual Defendants' positions within PharmaNet, which as discussed in the next

section, is insufficient to plead knowledge.[31]

Indeed, there is only one allegation that connects McMullen to PharmaNet's

change orders in general.  CW10 stated that McMullen signed every change order.  Id.

at ¶ 130.  This allegation is insufficient to show that McMullen had knowledge that the

reported backlog included unsigned change orders for two reasons: first, CW10 merely

states that he "printed the change orders . . . and left them with McMullen's Executive

Assistant," Id, which is not a sufficient basis of knowledge upon which to state that

"McMullen signed every change order."  Second, even if CW10 did have an adequate

basis of knowledge, simply alleging that McMullen signed the change orders does not

establish his knowledge of the inclusion of the change orders – unsigned by customers

– in PharmaNet's revenue and backlog.

---

[31]   It is well established that a pleading of scienter "may not rest on a bare
inference that a defendant 'must have had' knowledge of the facts." Greenstone v.
Cambex Corp., 975 F.2d 22, 26 (1st Cir. 1992) (Breyer, J.)(quoting Barker v.
Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 497 (7th Cir.1986)). Likewise,
allegations that a securities-fraud defendant, because of his position within the
company, "must have known" a statement was false or misleading are "precisely the
types of inferences which [courts], on numerous occasions, have determined to be
inadequate to withstand Rule 9(b) scrutiny."  Maldonado v. Dominguez, 137 F.3d 1,
10 (1st Cir. 1998). Generalized imputations of knowledge do not suffice, regardless
of the defendants' positions within the company. See Rosenbloom v. Adams, Scott &
Conway, Inc., 552 F.2d 1336, 1338-39 (7th Cir. 1977) ("A director, officer, or even
the president of a corporation often has superior knowledge and information, but
neither the knowledge nor the information necessarily attaches to those positions").

In sum, in over fifty paragraphs of statements made by confidential witnesses, not one witness claims to have met, emailed with, spoken to, or otherwise heard or read anything by, either of the Individual Defendants about PharmaNet's financial statements, calculation of backlog, recognition of revenue, impairment of goodwill, or any other topic, which would sufficiently raise a strong inference of scienter that Individual Defendants knew their public statements and disclosures were false.[32] See Druskin v. Answerthink, Inc., 299 F.Supp. 2d 1307, 1333 (S.D. Fla. 2004) (rejecting conclusory allegation that uncollectible accounts were "known" or "common knowledge").

---

[32]    In support of its claim that McMullen knew the Pfizer study had been "cancelled," Plaintiff relies on the following allegation:

> CW6 learned that PharmaNet expected to receive several small contracts from Pfizer to replace the large project that the Company lost, but these additional projects never materialized – a fact that Defendant McMullen personally acknowledged in an internal firm-wide email in March 2008, in which he indicated that PharmaNet had 'counted money it did not have in the bank,' suggesting that it had unduly relied on the award of contracts when it should not have.

Am. Compl. at ¶ 45.  This statement is inconsistent with Plaintiff's theory that a large Pfizer study on osteoporosis should not have been included in backlog because it had been delayed.  Additionally, the statement itself is vague and does not plead specifically what McMullen meant by Defendants had "counted money it did not have in the bank."  CW6's guess as to the meaning of the quote is insufficient to raise an inference of scienter.  Moreover, although CW6 does not reference the specific email, Defendants supply the Court with that email in their Certification in connection with the instant motion; notably, the email does not contain the quoted language allegedly stated by McMullen.  See McMullen's Email dated March 6, 2008.

## 2.      Imputed Knowledge Based on the Individual Defendants' Positions

Plaintiff contends that McMullen and Hamill certainly knew of the alleged illegal commercial practices asserted in the Amended Complaint because they were high-ranking executives in PharmaNet, and this fact raises an inference that they had intimate knowledge of those facts. Plaintiff's attempt to impute knowledge to the Individual Defendants by virtue of their employment has been rejected as a basis for an inference of scienter. <u>Advanta</u>, 180 F.3d at 539 (efforts to impute scienter to defendants "because of [their] positions within the company . . . are precisely the types of inferences which . . . [are] inadequate"); <u>see</u> <u>In re Exxon Mobil Corp. Sec. Litig.</u>, 387 F. Supp. 2d 407, 430 (D.N.J. 2005) ("allegations that a defendant, by virtue of his position within a company, must have known about the alleged fraud have been deemed conclusory and inadequate to withstand Rule 9(b) scrutiny . . . ").

## 3.      Core Business Doctrine

Plaintiff seeks to bolster its scienter allegations by appealing to the "core business doctrine." Plaintiff submits that knowledge of problems affecting the "core business" of a company are imputable to its officers. In so arguing, Plaintiff cites to a number of cases that do not support Plaintiff's reliance on this doctrine. These cases simply confirm the basic proposition that a person's status as a corporate officer, when considered alongside other allegations, can help support an inference that this person is familiar with the company's most important operations. <u>See</u> <u>Avaya</u>, 564 F.3d at 271; <u>In re Tellium , Inc. Sec. Litig.</u>, No. 02-5878, 2005 U.S. Dist. LEXIS 19467, at *79-80

(D.N.J. Jun. 20, 2005); <u>see also</u> <u>Aviva</u>, 2007 U.S. Dist. LEXIS 17347 at *54-55.  In other words, "it is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question."  <u>In re Heartland Payment Sys., Inc. Sec. Litig.</u>, No. 09-1043, 2009 U.S. Dist. LEXIS 114866, at *21 (D.N.J. Dec. 7, 2009); <u>In re Bio-Technology General Corp. Sec. Litig.</u>, 380 F. Supp. 2d 574, 596 (D.N.J. 2005). Accordingly, Plaintiff cannot rely on this doctrine when it has failed to allege other individualized allegations that McMullen and Hamill had knowledge of the facts at issue.

### 4.      Inferring Scienter from Improper Accounting Practices

Plaintiff contends its allegations that Defendants violated GAAP by recognizing unsigned change order revenue and failing to record interim impairment charge to goodwill, support an inference of scienter.  Allegations of GAAP violations "present nothing but a sub-group of the inaccurate public statement category of securities cases." <u>Intelligroup</u>, 527 F.Supp. 2d at 286.  In that regard – similar to the treatment of the core business doctrine – courts have uniformly held that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless plaintiffs' complaint alleges "more."  <u>See</u> <u>Wyser-Pratte Mgmt. Co. v. Telxon Corp.</u>, 413 F.3d 553, 563 (6th Cir. 2005); <u>Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P.</u>, 395 F.3d 851, 855 (8th Cir. 2005); <u>Saxton, Inc. Sec. Litig.</u>, 156 Fed. App. 917, 920 (9th Cir.

2005); <u>Pirraglia v. Novell, Inc.</u>, 339 F.3d 1182, 1192 (10th Cir. 2003); <u>Abrams v. Baker Hughes, Inc.</u>, 292 F.3d 424, 432 (5th Cir. 2002); <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1208 (11th Cir. 2001); <u>Stevelman v. Alias Research, Inc.</u>, 174 F.3d 79, 84-85 (2d Cir. 1999); <u>Malone v. Microdyne Corp.</u>, 26 F.3d 471, 479 (4th Cir. 1994). The decisions in this Circuit are no exception. <u>Westinghouse Sec. Litig.</u>, 90 F.3d 696 (3d Cir. 1996).

The court in <u>Intelligroup</u> summarized the pleading requirements in this context:

> it appears that the "more" envisioned by the courts consists of the panoply of such facts which could sufficiently indicate that defendants had clear reasons to doubt the validity of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual "red flags." <u>See Rothman</u>, 220 F.3d 81 (plaintiffs did not adequately plead scienter where the complaint alleged that defendants' policy of expensing prepaid royalties was contrary to GAAP, resulting in nearly $ 74 million in royalties continuing to be reported as assets long after they should have been expensed); <u>Comshare</u>, 183 F.3d at 553 (plaintiffs failed to plead scienter properly--although plaintiffs' allegations combined both GAAP violations and claims of failure to adequately monitor relevant information--since plaintiffs did not allege specific facts to show that defendants knew or could have known about the accounting errors, "or that their regular procedures should have alerted them to the errors sooner than they did") . . . <u>In re Health Mgmt. Inc. Sec. Litig.</u>, 970 F. Supp. 192 (E.D.N.Y. 1997) (a strong inference of recklessness is sufficiently pled where the complaint alleges that defendant was actually advised of but ignored "red flags").

<u>Intelligroup</u>, 527 F.Supp. 2d at 286-87.

Plaintiff has failed to plead sufficiently that Defendants' alleged violations of GAAP raise an inference of scienter. Rather than alleging that the Individual Defendants knew that their alleged illegal commercial practices violated GAAP but ignored it, Plaintiff argues that the Amended Complaint "details practices that could not possibly have had any legitimate business or accounting purpose, but instead

reflect "business nonsensicality" designed to make PharmaNet's financial condition appear more favorable." Pl. Opp. Br. at 25. In other words, Plaintiff does not point to any allegations in the Amended Complaint that demonstrate Defendants' knowledge of the violations; instead, Plaintiff posits that Defendants' disregard for certain accounting practices were so obvious that they must have been aware of the wrongs. Such conclusory, and indeed, insufficient, allegations cannot raise an inference of scienter on the part of the Individual Defendants.[33]

Viewing the Amended Complaint in its entirety, the Court finds that nonetheless, Plaintiff has failed to allege facts sufficient to support a strong inference of scienter. None of the motives suggested by Plaintiff are sufficient to show that Individual Defendants had the requisite culpability to deceive, manipulate or defraud. Indeed, the fact that McMullen and Hamill did not sell any PharmaNet stock during the Class Period tends to negate scienter. Likewise, Plaintiff's assertion that Defendants were motivated to artificially inflate PharmaNet's stock to fund the

---

[33] Likewise, Plaintiff alleges that Defendants violated their own company policy or procedures by including revenue in backlog from unsigned change orders and non-performing contracts. Specifically, Plaintiff avers that PharmaNet "performs an annual test for impairment of goodwill and other indefinite-lived intangible assets during the fourth quarter, or more frequently if impairment indicators arise during the year." Am. Comp. at ¶ 198. However, as indicated earlier in this Opinion, Defendants indeed performed such a test in third-quarter of 2008 – a quarter earlier than when PharmaNet previously represented that it would perform such a test. Additionally, Plaintiff has failed to allege any indicators that would have alerted Defendants to the necessity of performing a test prior to September 30, 2008. To the extent that Plaintiff argues that the indicators are the alleged illegal business practices, this is insufficient to raise an inference of scienter, because Plaintiff has not alleged with particularity that the Individual Defendants had knowledge of these practices.

Settlement is called into question by the fact that there were disclosures of adverse news regarding PharmaNet's financial health during the period of time when the price of the stock issued to fund the Settlement was being set. Plaintiff's remaining motives are the typical business motives in establishing scienter. Moreover, the Court has discounted Plaintiff's conclusory assertion that because of the Individual Defendants' positions, knowledge of wrongdoing should be imputed to them.

Plaintiff's allegations of recklessness and conscious misbehavior fare no better. Quite simply, the hodgepodge of non-specific confidential witness statements fail to sufficiently establish that the Individual Defendants had any first-hand knowledge of the alleged wrongdoings. Indeed, even if the allegations were sufficient to establish that there were various lower-level employees who knew about the ongoing problems and illegal practices at PharmaNet, there is nothing in the Amended Complaint that supports an inference that these issues were known to Defendants. Hence, if Defendants lacked knowledge of these issues, they could not have acted with the requisite culpability when they allegedly made misrepresentations regarding backlog in their public disclosures. Accordingly, having reviewed all alleged facts, the "plausible nonculpable explanations for Defendant's conduct" outweigh the "inferences favoring Plaintiff." Tellabs, 127 S. Ct. at 2510. In that respect, the Amended Complaint does not adequately allege scienter.

### V.    Loss Causation

At the outset, Plaintiff need not satisfy the PLSRA or Rule 9(b)'s heightened pleading requirements to survive a motion to dismiss for loss causation; rather, a plaintiff need only satisfy the requirements of Rule 8(a)(2). See Dura, 544 U.S. at 346 ("neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss"). Thus, while a plaintiff pleading loss causation need provide only, "a short and plain statement of the claim showing that the pleader is entitled to relief, " Fed. R. Civ. P. 8(a)(2), and need not provide "detailed factual allegations . . . [a plaintiff must provide] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . " Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

The requirement of "loss causation," also known as the "causation" element, refers to plaintiff's burden to plead a "causal link between the disclosure of alleged fraud and the economic harm ultimately suffered by the plaintiff." Intelligroup, 527 F. Supp. 2d at 296 (citations and quotations omitted); see 15 U.S.C. §78u-4(b)(4) (requiring a plaintiff to allege that the defendants' "act or omission . . . caused the loss" for which it seeks to "recover damages"). In other words, the plaintiff is required to plead that the decline in the stock price was caused by the market's discovery of defendant's fraud.  Id.  "[I]n order [t]o establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual

-74-

loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 297 (internal quotations omitted).

The Supreme Court has determined that defrauded investors must plead that the very misrepresentation at issue proximately caused them an economic loss. See Dura, 544 U.S. at 345.  The Court explained:

> [A]n inflated purchase price [does] not . . . constitute or proximately cause the relevant economic loss.
>
> [T]he logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. [So,] if . . . the purchaser sells the shares . . . before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  [Moreover, if] the purchaser sells . . . after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But that is far from inevitably so [since] that lower price [at the time of sale] may reflect not [the result of truth leaking out about] the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price . . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.
>
> Given the tangle of factors affecting price, . . . the higher purchase price . . . may prove to be a necessary condition of [an economic] loss, . . . but, even if . . . so, it is [not sufficient in and by itself since it is] not [the] cause [of the economic] loss . . . . The securities statute[] . . . make[s private] actions available not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause. . . . The statute . . . permit[s] . . . recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss. [Where] plaintiffs' lengthy complaint  contains only one statement that . . . can [be] fairly read as describing the loss [and that] statement says that the plaintiffs

> "paid artificially inflated prices for [the issuer's] securities" and suffered "damages," [the] complaint contains nothing that suggests [either a loss causation or an actual economic loss].

Intelligroup, 527 F. Supp. 2d at 296-97 (quoting Dura, 544 U.S. at 343-48 (emphasis supplied, citations omitted, original brackets removed)).

In other words, where the price of a security declines for reasons unrelated to the fraud, the investor has no right to recovery. Intelligroup 527 F. Supp. 2d at 297 (citing H.R. Conf. Rep. No. 104-369, at 31 (1995); Dura, 544 U.S. at 346). Additionally, "the complaint must contain facts sufficient to indicate that disclosure of the alleged fraud 'directly and proximately caused' the investment's decline in value or, at the very least, 'substantially contribut[ed to] the damages sustained' by the plaintiff." Id. (internal citations omitted).

A corrective disclosure by the defendant is not the only means by which the market may learn of a defendant's fraudulent statement or omission. Id. at 297, n.18, (citing Dura, 544 U.S. at 343). For example, "the market may learn of possible fraud [from] a number of sources: e.g., from whisteblowers, analysts questioning financial results, resignation of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." Id. (quoting Enron Corp. Sec. Derivative & "ERISA" Litig., 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005).

Here, to demonstrate loss causation, Plaintiff points to the fact that the price of PharmaNet's stock declined each time Defendants revealed that an aspect of the fraud

had adversely impacted PharmaNet's financial status.  Specifically, Plaintiff alleges that each of PharmaNet's quarterly public disclosures informed investors of the alleged fraud.  See Am. Compl. at ¶¶153, 164, 172, 182.  On February 28, 2008, in response to PharmaNet's negative financial numbers for the fourth quarter of 2007, see Id. at ¶¶147-152, PharmaNet's stock price fell from $41.35 per share on the previous day to $28.62, a 31% decline. Id. at ¶153. PharmaNet had announced a decrease in its backlog from $472.5 million at the end of the third quarter of 2007 to $457.4 million and a decrease in book-to-bill ratio from 1.3 to 0.8 over the same time period.  See Id. at ¶147. Plaintiff argues that this announcement began Defendants' dissemination to the market of the fraudulent inflation of PharmaNet's financial figures.  Plaintiff further argues that at that time, an analyst, David Windley, questioned the quality of PharmaNet's backlog, and this alerted the market to Defendants' alleged fraudulent activities.  Id. at ¶152.

On May 1, 2008, in response to PharmaNet's announcements of continued negative financial news for the first quarter of 2008, see Id. at ¶¶158-63, the price of its stock fell from $28.86 per share on April 30, 2008, to $17.10, a 28% decline. Id. at ¶164. PharmaNet had announced $59 million in contract cancellations over the previous two quarters, causing a decrease in direct revenue for the first quarter of $6.6 million, an increase in backlog from $387.9 million to $400.9 million, and an increase in book-to-bill ratio from 0.8x to 1.3x. Id. at ¶¶158, 161. These announcements,

Plaintiff argues, further disseminated to the market Defendants' fraudulent inflation of PharmaNet's financial numbers.

On September 12, 2008, in response to PharmaNet's further announcements of negative financial performance, see Id. at ¶¶166-71, the price of its stock fell from $23.06 per share on September 11, 2008 to $11.27, a 51% decline. Id. at ¶172. Then, PharmaNet announced that it was revising its guidance for full-year 2008, changing projected direct revenues from $390-399 million to $358-366 million, resulting from a 32.7% late-stage cancellation rate (compared to new business authorizations) as of August 31, 2008, and a reduction in expected late-stage revenue by $9 million resulting from a postponement of a project sponsored by "a large pharmaceutical company." Id. at ¶¶166-67. Plaintiff argues that these announcements constituted further dissemination to the market of Defendants' fraudulent inflation of PharmaNet's financial figures, and also put the market on notice of the purported cancellation/delay of PharmaNet's project with Pfizer.

Finally, on October 30, 2008, in response to PharmaNet's announcement on October 29, 2008, of further negative financial results for the third quarter of 2008, see Am. Compl. at ¶¶177-81, PharmaNet's stock bottomed out at $1.46 per share, marking a 96% decrease in the value of its stock over the course of the Class Period. Id. at ¶182. Plaintiff alleges that PharmaNet had announced, among many things, that it was in the course of determining the amount of a non-cash goodwill impairment charge as a result of the fall of its market capitalization, a decline in backlog from $597.2 million

-78-

on September 30, 2008 to $521.6 million on September 30, 2008, a reduction in book-to-bill ratio from 2.0x on June 30, 2008 to 0.4x on June 30, 2008, and a 25% reduction in direct revenues from third quarter 2007 compared to the third quarter of 2008, due to cancellations and a postponement scheduled to resume in early 2009. Id. at ¶¶177, 180. Plaintiff argues that these announcements disclosed to the market the full scope of the severity of PharmaNet's financial condition.

These allegations are not sufficient to meet the loss causation element; noticeably absent is any assertion that any wrongdoing was disclosed to the market. In fact, none of the announcements made by Defendants mention any alleged fraudulent practices. Specifically, PharmaNet's announcement in September 2008 of a downward revision to guidance did not reveal any of the alleged fraud, but rather, it focused on the cancellations of contracts, a business problem which was frequently discussed in many of PharmaNet's public disclosures. See, e.g., ¶¶ 147, 150-151, 158, 160-162, 166, 169.

There are no allegations anywhere in Amended Complaint that the market learned that "client dissatisfaction" with PharmaNet's performance was the cause of PharmaNet's contract cancellations through the first quarter of 2008, or that one of PharmaNet's clients went to a competitor. To the contrary, as noted above, McMullen stated publicly that PharmaNet's customers were not dissatisfied with the Company's performance.

Likewise, the Amended Complaint is devoid of any allegations that the market ever learned that PharmaNet's backlog was materially overstated by including the delayed Pfizer project or the unsigned changed orders. Again, just the opposite is true. PharmaNet informed investors that it does not recognize revenue from change orders that have not been authorized by customers. Moreover, Plaintiff never alleged that Defendants' failure to timely record an impairment charge was disclosed. Indeed, the impairment announcement was made after the market closed on October 29, 2008, and when the market closed on October 30, 200, PharmaNet's stock price actually rose, and continued to increase for several days. See Defendants' Ex. 11 (PharmaNet's daily price per share in October 2008) (October 29, 2008: $1.25; October 30, 2008: $ 1.46; October 31, 2008: $1.60).

To demonstrate loss causation, Plaintiff improperly relies on negative financial results after each of the quarterly public disclosures when there have been no allegations that the market recognized any of the alleged fraud, or that the cause of the decline in stock price was substantially caused by the alleged fraud. Indeed, this type of pleading has been rejected to show loss causation because it does not adequately demonstrate a market correction of the artificial inflation caused by Defendants' misrepresentations.[34] In re Tellium, Inc. Securities Litigation, No. 02-5878, 2005 U.S.

---

[34]   In addition, Plaintiff relies on several commentators and analysts to establish loss causation. Specifically, David Windley, an analyst, raised issues with the quality of PharmaNet's backlog during a conference call on February 28, 2008. See Am. Compl. at ¶ 152,("I guess I am just wondering what checks and balances are in place to ensure that the business that is being won and put into backlog is high quality"); ¶ 154 ("Windley has opined that 'backlog has to grow,' and acknowledged that the Company exhibited an "abnormally high cancellation rate . . ."). In fact,

Dist. LEXIS 26332, at *12-14 (D.N.J. Aug. 26, 2005) (Tellium II) (citing D.E. & J. Limited P'Ship v. Conaway, 133 Fed. Appx. 994, 1000-01 (6th Cir. 2005) (holding that plaintiffs' allegations of a stock price drop following a disclosure that it had filed for bankruptcy reorganization did not adequately show loss causation because they did not allege that the announcement disclosed any prior misrepresentation to the market resulting in a subsequent price drop in the stock)); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2nd Cir. 2005) (holding that stock price drop following downgrade of stock did not amount to a corrective disclosure because the downgrades did not reveal to the market the falsity of the prior recommendations); In re IPO, Liu v. Credit Suisse First Boston Corp., 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (holding that a failure to meet earnings forecasts does not have a corrective effect because it does not "disclose the scheme" and therefore "cannot correct the artificial inflation caused by the scheme."); compare Semerenko, 223 F.3d at 186 (holding that Plaintiffs pled loss

---

the Amended Complaint avers several other similar discussions of PharmaNet's financial health from commentators and analysts. See, e.g., Id. at ¶¶ 155, 173-176, 183, 190-191. To the extent that some of these reports merely provided more details about the public disclosures, they are insufficient to establish loss causation. See In re Retek Inc. Sec. Litig., 621 F. Supp. 2d 690, 705 (D. Minn. 2009) ("[C]onfirmatory information -- that information already known to the market -- may not constitute such a corrective disclosure" (quotations omitted)). Similarly, to the extent that these analysts raised certain issues regarding PharmaNet's financial health and outlook, it is also insufficient to show loss causation as these reports were vague and speculative. See Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc., No. 06-2674, 2009 WL 890479, at *55 (D. Ariz. Mar. 31, 2009)(analyst report questioning defendants' stock option was not a corrective disclosure because "speculative observations" do not satisfy Dura's pleading requirements); In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 679-80 (S.D.N.Y. 2007)(third-party comments in news article and other reports noting concerns about defendant's accounting practices were not corrective disclosures).

causation where they alleged that the stock was allegedly inflated by misrepresentations concerning Cendant's financial condition and its willingness to complete a tender offer and proposed merger, and that it dropped when the truth was made known upon an audit report that included findings of "fraudulent financial reporting" and the announced termination of the planned merger); The Archdiocese of Milwaukee Supporting Fund, Inc. v.  Halliburton Co. No. 08-11195, 2010 U.S. App. LEXIS 3226, at *7 (5th Cir. Feb. 12, 2010) ("it is not enough merely to show that the market declined after a statement reporting negative news; . . . it is the misrepresentations themselves, not the corrective disclosures, which form the basis of a valid securities fraud claim. . . . Unless actionable statements, which were later corrected, are identified, Plaintiffs cannot establish loss causation" ).

In Tellium II, this Court considered allegations substantively indistinguishable from those of the instant action: a plaintiff alleging that a defendant issued "false sales expectations," and made a purported "curative disclosure" that failed to "expose[] that the $ 288 million revenue projections were not based upon real contractual commitments." See Id. at *12. The purported "disclosure" in Tellium II, like those offered by Plaintiff, served to merely lower revenue expectations, which is not a disclosure of an alleged scheme. See Id.

Similarly, the court in Payne found that several announcements made by defendant company were insufficient to show loss causation because "not one of the alleged misrepresentations or omissions about the Company's liquidity problems,

accounting manipulations, backlog overstatement, or other fraud [was] disclosed in the announcements Plaintiffs allege[d] caused precipitous drops in the stock price." Payne, 433 F. Supp. 2d at 610.  The court explained that "[w]hile the precarious financial condition of the Company was publicly acknowledged . . . nothing indicated that the cause of its demise was the result of Defendants' fraudulent activities." Id.; see also Metzler Investment GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1063-64 (9th Cir. 2008); In re Downey Sec. Litig., No. 08-3261, 2009 WL 2767670, at *16 (C.D. Ca. Aug. 21, 2009)(finding no loss causation because the public  disclosures relied upon by plaintiff did "not contain a disclosure of wrongdoings, and at best, demonstrate[d] only that the market learned of and reacted to [defendant's] 'poor financial health' rather than any alleged fraud).[35]   Accordingly, Plaintiff fails to allege that PharmaNet's public disclosures informed investors any of the so-called "truths."  The allegations as they stand now, only show that PharamNet's stock price dropped predominately as a result of announcements of disappointing financial results rather than disclosures of any misrepresentations or omissions.

---

[35]   Plaintiff attempts to show loss causation by contending that the Amended Complaint alleges that the concealed risks associated with the fraud materialized during the Class Period. In other words, Plaintiff argues that because significant aspects of the still-concealed fraud actually provided the catalyst for an anticipated failure to meet earnings forecasts, the share price decline following PharmaNet's public disclosures indeed disseminated the fraudulent price inflation.   In so arguing, Plaintiff relies on out-of-circuit cases.  While the Court questions whether Plaintiff has sufficiently pled this theory, the Court need not consider it because the Third Circuit has not endorsed this type of pleading as a way to establish loss causation.  See Glover v. DeLuca, No. 03-0288, 2006 WL 2850448, at *33 (W.D. Pa. Sep. 29, 2006); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 181, n.24 (3d Cir. 2001).

In light of the fact that Plaintiff has failed to sufficiently plead the elements of a Section 10(b) claim, Plaintiff's claim against Defendants under Section 10(b) is therefore dismissed without prejudice; however, the Court dismisses the allegations regarding the inclusion of Pfizer's delayed contract in PharmaNet's backlog with prejudice.

## VI.  Section 20(a) claims

Plaintiffs also alleges that Individual Defendants are liable under Section 20(a) of the Exchange Act. See Am. Compl. at ¶¶251-53. This statute reads, in pertinent part:

§ 78t. Liability of controlling persons and persons who aid and abet violations

(a)  Joint and several liability

. . .

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . .

15 U.S.C. §78t(a); see also Suprema, 438 F.3d at 285 (discussing the statute). However, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." Avaya, 564 F.3d at 252 (citing In re Alpharma Sec. Litig., 372 F.3d 137, 153 (3d. Cir. 2004)). Because Plaintiff fails to sufficiently plead a claim under Section 10(b), it is "impossible to hold the [Individual Defendants] liable under §20(a)." Shapiro v. UJB Fin. Co., 964 F.2d 272, 279 (3d Cir 1992). The Section 20(a)

-84-

claims against Individual Defendants McMullen and Hamill are therefore also dismissed without prejudice.

## VII.   Conclusion

Based upon the foregoing findings, the Court grants Defendant's motion and dismisses Plaintiff's claims without prejudice.  However, Plaintiff shall have thirty days from the date of the Order accompanying this Opinion to cure these pleading deficiencies consistent with the Court's Opinion, with the exception of the allegations regarding the delayed Pfizer osteoporosis study.  These allegations are dismissed with prejudice for the reasons stated supra.

DATED:  March 30, 2010                              /s/ Freda L. Wolfson
                                                        Freda L. Wolfson
                                                        United States District Judge